799 A.2d 751

**MACHIPONGO LAND AND COAL COMPANY, INC. and The Victor E. Erickson Trust and Joseph Naughton, Appellees,**

v.

**COMMONWEALTH of Pennsylvania, Department of Environmental Protection, The Environmental Quality Board and Arthur A. Davis, Secretary of Environmental Protection, Appellants.**

Supreme Court of Pennsylvania.

Argued Nov. 13, 2001.

Decided May 30, 2002.

4

6

8

Michael David Bedrin, Wilkes Barre, K. Scott Roy, James M. Sheehan, Harrisburg, for Department of Environmental Resources.

Richard P. Mather, Joseph G. Pizarchik, Harrisburg, for Com., Dep., et al.

John J. Walliser, for Pennsylvania Environmental Council, amicus curiae.

William W. Warren, Jr., Harrisburg, Timothy J. Dowling, for Pennsylvania League of Cities and Municipalities, amicus curiae.

Thomas L. Wenger, Harrisburg, PA ST Assoc. of Township Supervisors, amicus curiae.

Enrico Genaro Nardone, Trucksville, John D. Echeverria, for 10,000 Friend of PA, Citizens for Pa's Future & Pa's Trout.

Carl A. Belin, Clearfield, Joel R. Burcat, Harrisburg, for Machipongo Land and Coal Co.

David James Porter, Pittsburgh, for Pacific Legal Foundation/PA Farm Bureau/PA Builders Assoc., amicus curiae.

Gregory Barton Abeln, Carlisle, for Washington Legal Foundation (WLF) and the PA Chamber of Business and Industry, amicus curiae.

Henry McC. Ingram, for PA Coal and PA Landowners Associations, amicus curiae.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, and SAYLOR, JJ.

### OPINION

NEWMAN, Justice.

When state government determines that an intended use of private property conflicts with legitimate public purposes, there can be no doubt concerning the power of the government to prohibit the private use. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124–125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Machipongo Land and Coal Co., Inc. v. Commonwealth*, 544 Pa. 271, 676 A.2d 199, 202 (1996). Indeed, "[l]ong ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.'" *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 491–492, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (quoting *Mugler v. Kansas*, 123 U.S. 623, 665, 8 S.Ct. 273, 31 L.Ed. 205 (1887)). However, in our constitutional democracy, government's power to protect the public is tempered by the level of intrusion upon individual property rights. The United States Constitution provides:

> No person shall be ... deprived of ... property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. CONST. amend. V. Similarly, the takings clause in the Pennsylvania Constitution provides:

> [N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured.

PA. CONST. art. I, § 10. On the other hand, the responsibility of government to protect the environment from private injury is also clear. PA. CONST. art. I, § 10 provides that:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

In this case, we are required to weigh the governmental obligation to protect the environment against the individual right to do as one wishes with property one owns.

Specifically, this case asks us to determine whether the designation of the Clearfield County Goss Run Watershed as unsuitable for mining ("UFM"), pursuant to Section 4.5 of the Pennsylvania Surface Mining Conservation and Reclamation Act ("PaSMCRA"), Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. § 1396.4e(b), was so unduly oppressive so as to constitute a taking.

## The Regulation, its Origins, and Purposes

In 1980, the General Assembly amended the PaSMCRA to comply with the Federal Surface Mining Control and Reclamation Act (FSMCRA), 30 U.S.C. § 1201, which required states that wished to regulate mining to meet specific federal requirements. Among those requirements, was one directing states to create a mechanism to designate certain lands as UFM. 30 U.S.C. § 1272. In Section 1201(c), Congress ex-

plained that FSMCRA was necessary to protect the environment, its water and its streams from pollution caused by mining. Section 1201(c) provides:

[M]any surface mining operations result in disturbances of surface areas that burden and adversely affect commerce and the public welfare by destroying or diminishing the utility of land for commercial, industrial, residential, recreational, agricultural, and forestry purposes, by causing erosion and landslides, by contributing to floods, by polluting the water, by destroying fish and wildlife habitats, by impairing natural beauty, by damaging the property of citizens, by creating hazards dangerous to life and property by degrading the quality of life in local communities, and by counteracting government programs and efforts to conserve soil, water, and other natural resources.

30 U.S.C. § 1201(c).

In *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), where the U.S. Supreme Court rejected a claim that the FMCRA was facially unconstitutional, the Court also explained the purposes of the FMCRA by quoting U.S. Senate and House Committee reports. Those reports detailed the need for legislation to protect the environment from the "adverse effects of surface coal mining." *Id.* at 279, 101 S.Ct. 2352. The Senate Report concluded that:

[Surface] coal mining activities have imposed large social costs on the public ... in many areas of the country in the form of unreclaimed lands, water pollution, erosion, floods, slope failures, loss of fish and wildlife resources, and a decline in natural beauty.

*Hodel*, 452 U.S. at 279, 101 S.Ct. 2352 (quoting S.Rep. No. 95–128, p. 50 (1977)). The House Report noted the effect on streams. It stated:

Acid drainage which has ruined an estimated 11,000 miles of streams; the loss of prime hardwood forest and the destruction of wildlife habitat by strip mining; the degrading of

productive farmland; recurrent landslides; siltation and sedimentation of river systems....

*Hodel*, 452 U.S. at 279–280, 101 S.Ct. 2352 (quoting H.R.Rep. No. 95–218, p. 58 (1977), 1977 U.S.C.C.A.N. 596, (quoting H.R.Rep. No. 94–1445, p. 19 (1976)).

Pennsylvania codified the federal criteria to be used to determine whether land should be deemed unsuitable for mining. 52 P.S. § 1396.4e(b). 52 P.S. § 1396.4e(b) provides:

(b) Pursuant to the procedures set forth in this subsection, the department may designate an area as unsuitable for all or certain types of surface mining operations if such operations will:

(1) be incompatible with existing State or local land use plans or programs;

(2) affect fragile or historic lands in which such operations could result in significant damage to important historic, cultural, scientific and esthetic values and natural systems;

(3) affect renewable resources lands in which such operations could result in a substantial loss or reduction of long-range productivity of water supply or of food or fiber products and such lands to include aquifers and aquifer recharge areas; or

(4) affect natural hazard lands in which such operations could substantially endanger life and property, such lands to include areas subject to frequent flooding and areas of unstable geology.

The General Assembly recited that the purpose of the PaSMCRA is to "prevent ... the pollution of rivers and streams," protect wildlife and the environment generally, and to maintain jurisdiction over in-state mining activities. 52 P.S. § 1396.1. Additionally, the regulation sought to "strike a balance" between the environment and ensuring a ready supply of coal. *Id.*

### The UFM Designation and the Property of Machipongo Land and Coal Co., Inc., the Victor E. Erickson Trust and Joseph Naughton

Pursuant to 52 P.S. § 1396.4e(b), in May of 1989, the Brisbin Recreation Board and the Locust Grove Sportsmen

Club filed a petition with the Pennsylvania Department of Environmental Resources [1] ("DER") requesting that the Goss Run Watershed (the "Watershed") be declared unsuitable for mining. The Petition sought a UFM designation for the entire area of the Goss Run stream extending to a point below the Brisbin Dam.

The regulation, which would have the effect of prohibiting the mining of coal in a large portion of the Watershed, affected the rights of the owners of property in the UFM area. Those property owners included Appellees, Machipongo Land and Coal Co., Inc., the Victor E. Erickson Trust and Joseph Naughton (Collectively, the "Property Owners").

Machipongo Land and Coal Co., Inc. ("Machipongo") is a Pennsylvania corporation, doing business in Clearfield County, Pennsylvania. Machipongo owns in fee simple 373 acres within the UFM area and 200 acres outside of the area. (R. 260a, 403a–405a, 414a). It also owns a coal estate of 1000 acres in Clearfield County outside of the UFM area. (R. 260a). Arthur Minds, a Machipongo Vice President, testified at trial that sometime around 1915 or 1917 his grandparents acquired the Machipongo property. (R. 1037a). He said that his grandfather was in the coal business and that Machipongo now holds the property for future coal development. *Id.* Machipongo stipulated that it did not know what its predecessors in title paid for the property (R. 263a) and the record does not disclose whether Machipongo paid anything for its interest.

Machipongo has owned the property for approximately forty-eight years and owned it on May 23, 1992, the effective date of the UFM designation. (R. 263a). The parties also stipulated that Machiongo has used land within the UFM area for purposes other than coal mining. Specifically, Machipongo has sold timber and entered into leases for gas development. *Id.* at R. 262a–263a.

1. Effective July 1, 1995, the General Assembly renamed the Department of Environmental Resources the Department of Environmental Protection. 71 P.S. § 1340.101.

The Naughton/Erickson Property Owners also own property in the UFM area. They own a coal estate of fifty-two acres within the UFM area and a fee simple title to 1,150 acres and 250 acres of coal estate situated outside of the UFM area. (R. 260a). The parties also stipulated that the Naughton/Erickson Property Owners have used their land for purposes other than coal mining, including entering into leases for gas development. (R. 263a).

The Naughton/Erickson property is owned jointly. Specifically, Joseph Naughton owned a 1/5 interest and Victor E. Erickson owned the remaining 4/5 interest. (R. 256a, 260a, 263a). Joseph Naughton obtained his interest through a series of deeds dated February 17, 1961 as a distribution from the Estate of William Henry Naughton, who obtained his interest pursuant to deeds dated April 26, 1945. (R. 260a).

Victor E. Erickson was one of four people who obtained an interest in the land in the 1940s from the Elk River Coal Co. ("Elk River"). Elk River was affiliated with the Berwin & White Coal Co., where Victor E. Erickson had been a long-time employee responsible for closing mines and disposing of company property. (R. 104a–105a). Victor E. Erickson then purchased the interests of the other three for an unknown sum. (R. 105a). In 1984, Victor E. Erickson transferred his interest to the Victor E. Erickson Trust, retaining a life estate for himself, followed by a life estate in his wife. (R. 288a–303a). Upon the death of Victor E. Erickson and his wife on August 23, 1985 and March 26, 1991 respectively, the beneficiaries of the Victor E. Erickson Trust were the sole owners of their interest in the property. (R. 1077a). The Victor E. Erickson Trust was the owner of the Erickson interest on the date DER designated the property UFM. *Id.* On December 16, 1994, the beneficiaries of that trust created a new trust, the Erickson Family Trust, to which they transferred their interest in the land. (R. 256a). The beneficiaries of the Erickson Family Trust were the same people who, in 1992, originally commenced this lawsuit, in their capacity as remainder beneficiaries of the Victor E. Erickson Trust. (R. 1077a).

On January 5, 1990, Property Owners requested and were granted leave to intervene in the DER administrative proceedings. (R. 257a). At the public hearing, Property Owners presented fact and expert witnesses. (R. 258a–259a). After the hearing, DER conducted a technical study to determine whether to designate the Watershed as UFM pursuant to the criteria set forth in 52 P.S. § 1396.4e. (R. 258a). According to the Commonwealth Court, the study concluded that surface mining of coal within the Watershed had a **"high potential to cause increases in dissolved solid and metal concentrations in Goss Run that would adversely affect the use of the stream as an auxiliary water supply"** and **"a significant potential to disrupt the hydrologic balance causing decreases in the net alkalinity of discharges ... destroying the habitat for wild trout populations."** *Machipongo Land and Coal Co., Inc. v. Commonwealth,* No. 248 M.D.1992, slip op. at 3 (Pa.Cmwlth. August 21, 2000) (emphasis added).

Consequently, DER recommended that the Environmental Quality Board ("EQB") approve a regulation designating the surface mineable coals located within the Watershed upstream of the Brisbin Dam as UFM.[2] The EQB approved the proposed regulation. The regulation provides:

The surface mineable coal reserves within the Goss Run Watershed upstream of the Brisbin Dam, including a small tract of land within the watershed of the West Tributary to Goss Run, a total of approximately 555 acres, are designated unsuitable for all types of surface mining activities.

25 Pa.Code § 86.130(h)(14).

### Procedural History

In 1992, Property Owners sued the Commonwealth of Pennsylvania, DER, EQB and DER Secretary Arthur A. Davis (collectively, the "Commonwealth"). Property Owners claimed that the regulation took their property without com-

**2.** The final regulation was substantially more limited than the proposal. Specifically, the UFM designation did not extend past the Brisbin Dam. The regulation also provided that it did not apply to areas within the UFM area where DER had previously permitted mining, including the Bonita and Cowfer permit areas. 25 Pa.Code § 86.130(h)(14).

pensation. They requested that the Commonwealth Court declare the regulation invalid and refer the case to the Common Pleas Court for a determination of damages pursuant to the Eminent Domain Code. *Machipongo Land and Coal Co., Inc. v. Commonwealth,* 155 Pa.Cmwlth. 72, 624 A.2d 742, 746 (1993) (*Machipongo I*).

In response to the 1992 complaint, the Commonwealth filed preliminary objections and a demurrer. *Id.* at 745. The court considered the arguments of the parties and determined that the section of the PaSMCRA at issue was not facially unconstitutional; *Id.* at 750, but that the Environmental Hearing Board ("EHB") should determine whether its application to the Property Owners constituted a taking. *Id.* at 753–755. The court also held that because it would have been futile to seek further administrative relief, Property Owners did not fail to exhaust their administrative remedies. *Id.* at 751.

Property Owners appealed to this Court. *Machipongo Land and Coal Co., Inc. v. Commonwealth,* 538 Pa. 361, 648 A.2d 767 (1994) (*Machipongo II*). We affirmed the Commonwealth Court's determination that Property Owners need not have pursued further administrative relief before seeking redress from the courts. *Id.* at 769. However, we disagreed with the holding of the court to the extent that it stated that the EHB was the proper forum in which the case should proceed. Instead, we determined that the Court of Common Pleas of Clearfield County had jurisdiction. *Id.* at 770.

Thereafter, we granted reargument to consider whether the Commonwealth Court or the Court of Common Pleas should have jurisdiction over further proceedings to resolve the issue of whether the "state action taken pursuant to its police powers [had] gone too far and constitute[d] a *de facto* taking requiring the state to provide just compensation." *Machipongo Land and Coal Co., Inc. v. Commonwealth,* 544 Pa. 271, 676 A.2d 199, 203, n. 3 (1996) (*Machipongo III*). We observed that the Judicial Code provides that the Commonwealth Court shall have jurisdiction over all civil actions against the Commonwealth, but shall not have jurisdiction in eminent domain proceedings. *Id.* (citing 42 Pa.C.S. § 761).

We then examined the nature of the action against the Commonwealth to determine whether it fell within the eminent domain exception to the jurisdiction of the Commonwealth Court. *Machipongo III*, 676 A.2d at 202. Because the PaSMCRA, the basis for the regulation the Property Owners challenged, was promulgated pursuant to the police power[3] and not the power of eminent domain, we determined that the exception to jurisdiction did not apply. *Id.* at 202–203. Consequently, we vacated our prior Order only to the extent that it had remanded the case to the Court of Common Pleas. Instead, we returned the matter to the Commonwealth Court to consider whether the regulation constituted a taking.

Property Owners then filed a petition for review with the Commonwealth Court. They challenged the designation of their property as UFM. *Machipongo Land and Coal Co., Inc. v. Commonwealth*, 719 A.2d 19 (Pa.Cmwlth.1998) (*Machipongo IV*). The Commonwealth moved for summary judgment, asserting that the designation was a proper exercise of police power and was not unduly oppressive. *Id.* at 23. Property Owners argued that the regulation had deprived them of the right to mine their coal and that it was a taking because it denied them all economic use of their property. *Id.* The Commonwealth Court recited factors that the U.S. Supreme Court has identified as relevant to the determination of whether a categorical taking had occurred:

- whether the public interest requires regulatory interference with the property right;

3. Section 1 of the PaSMCRA provides, in pertinent part, that: "[the] act shall be deemed to be an exercise of the police powers of the Commonwealth for the general welfare of the people of the Commonwealth[.]" 52 P.S. § 1396.1.

 Regulations promulgated pursuant to the police power are distinguishable from those issued pursuant to the eminent domain power of the Commonwealth. In *Machipongo III*, 676 A.2d at 202, this Court quoted its decision in *Appeal of White*, 287 Pa. 259, 134 A. 409 (1926), where we stated that:

 [P]olice power should not be confused with that of eminent domain. Police power controls the use of property by the owner, for the public good, its use otherwise being harmful, while eminent domain and taxation take property for public use....

 *Id.* at 411.

- whether the regulation is reasonably related to that goal;

- whether the amount of property taken deprives an owner of all economical viable uses of the property, measured by what is taken (the numerator) against what was left (the denominator);

- whether the property owner's actions or proposed actions would cause a nuisance.

*Id.* at 26 (citing *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). The Court then discussed the problems courts have had in determining what parcel of land to use as the denominator in the third factor articulated above. *Machipongo IV,* 719 A.2d at 26. Citing John E. Fee, *Unearthing the Denominator in Regulatory Takings Claims,* 61 U. Chi. L.Rev. 1535 (1996), the Commonwealth Court decided to use the coal estates within the UFM area as the denominator.[4] *Machipongo IV,* 719 A.2d at 29. Because the takings equation compares the use taken away by the regulation with all the possible uses, the decision to use the coal estates as the denominator guaranteed a taking unless application of the following three considerations, listed by the Commonwealth Court, made the property valueless. Those considerations were:

1. whether the regulated land had value prior to the regulation;

2. whether the regulated land has a separate use from the non regulated contiguous parcel(s); and

4. However, the approach of the law review article was never intended to apply in vertical segmentation cases. Specifically, the article explained that:

> [u]nder a rule of substantiality, however, the ability of the owner to define the parcel would be limited in two important ways. First the rule would apply only to horizontal divisions of land. Under clear Supreme Court precedent, a property owner would have no authority to divide property rights into uses, easements, servitudes or the like. In addition, under the authority of [*Penn Central,* 438 U.S. 104, 98 S.Ct. 2646] and *Keystone,* **courts must consider all air, surface, and subsurface rights of a particular parcel as a single bundle of property rights.**

Fee, 61 U. Chi. L.Rev. at 1558 (emphasis added).

3. if the regulated land has value separate from the contiguous land, whether all of its economic benefit is gone.

*Id.* at 28. The Commonwealth Court explained that the purpose of the considerations was to ensure that it did not find a taking if the subject land did not have any value. That is, if the land did not have value before the regulation, there is no taking because the government should not be deemed to take property that has no independent value. On the other hand, if the land had value separate from unregulated contiguous land, and the regulation made the land valueless, the regulation would constitute a taking. *Id.*

The Commonwealth Court then cited to Pennsylvania cases that have held that Pennsylvania recognizes separate estates in the same piece of land including: surface; coal/mineral; and support. The court reasoned that because the estates in land may be separated for purposes of ownership, the coal estate should be used as the parcel to determine whether a taking has occurred. Because it found that issues of fact existed; though, as to whether the coal estate had any independent value, the court denied the summary judgement motion. *Id.* at 30.

Senior Judge Rodgers dissented. He would have granted summary judgment in favor of the Commonwealth because he believed that the majority improperly used the coal estates as the denominator in the takings equation. *Machipongo IV,* 719 A.2d at 30. He explained that:

> [the Commonwealth Court] has acknowledged that for the purpose of deciding taking issues under the federal constitution, the vertical division recognized in Pennsylvania law that coal, surface, and the right to support are three separate estates is without significance.

*Id.* In his view, the alternative uses of the property and the fact that the regulation affected a relatively small portion of their property foreclosed the finding of a taking.

> It is undisputed that the petitioners in this case have other uses for their properties, including the sale of oil and gas rights, the sale of timber, and the sale of land for residential

and other uses. The petitioners have therefore failed to adduce any evidence of a taking under federal law.

*Id.* Consequently, Senior Judge Rodgers would have held that the regulation was not a taking. *Id.* at 31.

After denying the summary judgment motion, the Commonwealth Court addressed the question of whether the Commonwealth would be allowed to introduce evidence at trial that the proposed mining activities would constitute a public nuisance. *Machipongo Land and Coal Co., Inc. v. Commonwealth,* No. 248 M.D.1992, slip op. at 2 (Pa.Cmwlth. October 28, 1999) (*Machipongo V*). The Commonwealth argued, pursuant to *Lucas, supra.,* that if the Property Owners' proposed actions constituted a nuisance, the regulation could not be a taking. Rejecting that argument, the Commonwealth Court declined to permit the Commonwealth to present evidence of nuisance because it held, as a matter of law, that the proposed actions of Property Owners could not rise to the level of a public nuisance. *Machipongo Land and Coal Co., Inc. v. Commonwealth,* No. 248 M.D.1992, slip op. at 8 (Pa.Cmwlth. August 21, 2000) (Machipongo VI).

The case proceeded to trial where Property Owners claimed that the regulation was a taking with regard to their coal rights as to three separate sections of the UFM area.[5] Because the Commonwealth Court had already determined that the coal estates (as opposed to the property as a whole) were to be used as the takings denominator, the only fact that the Commonwealth Court deemed to be at issue was "whether there ... [was] sufficient mineable coal, in amount and quality, for ... [Property Owners] to economically mine each of those reserves." *Id.* at 12–13.

The Commonwealth Court did not address the issue of compensation. Instead, it explained that "if any and all of the reserves are economically mineable, then the UFM designa-

5. Erickson Surface Reserves: a 27–acre area west of the Bonita Surface Mining Pit; Machipongo Surface Reserves: a 35–acre area within the Watershed east of Goss Run and southeast of the Bonita Surface Mining Pit; and, Machipongo Underground Reserves: a 96–acre area west of Goss Run within the Goss Run UFM designation.

tion for that portion of the coal reserves deemed mineable will be stricken." *Id.* After consideration of detailed scientific evidence of the economic viability of mining coal in the UFM area, the Commonwealth Court determined that "because ... the proposed [Naughton/Erickson] Surface Mine and the Machipongo Underground mine [we]re economically viable, ... the ... designation [as UFM with regard to those areas] is stricken from the regulation." *Id.* at 37–38. However, "because the Machipongo Surface Mine ... [is] not economically feasible, nothing was taken and the designation for that area remains in place." *Id.* at 38. Therefore, the Commonwealth Court struck the regulation with regard to part of the UFM area but not with regard to the entire area.

The parties appealed the Order of the Commonwealth Court. On September 26, 2001, we directed the parties to file supplemental briefs to address the following additional issues:

(1) whether the regulatory designation of certain areas as unsuitable for mining amounted to a regulatory taking;

(2) if such a taking has occurred, by what means may damages be sought, and;

(3) whether such a taking constitutes a personal right that passes to a successor in interest.

*Machipongo Land and Coal Co., Inc. v. Commonwealth,* Nos. 112 and 119 MAP 2000, Per Curiam Order at 1 (Pa. September 26, 2001).

## Discussion

■ The Commonwealth contends that Erickson, a Property Owner, lacks standing to pursue its takings claim because the beneficiaries of the Victor E. Erickson Trust, the owner of the Erickson interest on the date DER designated the property UFM, transferred their interest in the Erickson property to the Erickson Family Trust. (R. 256a). The question is whether the transfer to the Erickson Family Trust divests Erickson of its standing to pursue a takings claim.

The U.S. Supreme Court has recently addressed the issue of standing in the context of another takings case. *See*

*Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). *Palazzolo* is instructive in this case because it sets forth the position of the U.S. Supreme Court on the issue of whether a party who does not own regulated property on the effective date of a regulation, but later acquires it, has standing to assert a takings claim.[6] Therefore, we turn to the facts of *Palazzolo.* In 1957, Shore Gardens Inc., a corporation that Mr. Palazzolo formed with some associates, purchased land in Westerly, Rhode Island. After the purchase, Mr. Palazzolo bought out the other investors and became the sole shareholder. In 1971, Rhode Island created the Rhode Island Coastal Resources Management Council, which enacted regulations that prohibited building in wetlands unless there was a compelling public purpose for an exception. *Id.,* 121 S.Ct. at 2456. In 1978, the corporation was dissolved for failing to pay its taxes. As a result, by operation of Rhode Island Law, Mr. Palazzolo became the owner.

Mr. Palazzolo submitted a proposal to the Coastal Council for permission to fill eleven of his remaining eighteen acres to build a beach club. *Id.* The Coastal Council denied his application and the lower courts upheld the denial. On appeal, the Rhode Island Supreme Court held, among other things, that he lacked standing to raise an objection to the regulation because he became the owner of the property after the enactment of the regulations.

The U.S. Supreme Court reversed. Although the justices addressed the standing issue in several separate Opinions, a majority held that Mr. Palazzolo had standing to raise the takings claim notwithstanding that ownership of the property was transferred to him after the effective date of the regulation. 121 S.Ct. at 2457. In regulatory taking cases that do not involve a physical invasion of private property, Justice Kennedy, Justice Thomas, and Chief Justice Rehnquist de-

6. Although we are not bound by the decisions of the U.S. Supreme Court on issues of standing (*see ASARCO Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 2045, 104 L.Ed.2d 696 (1989)), we find the reasoning of that Court persuasive.

clined to adopt a "blanket rule" that would prevent a subsequent owner from asserting a taking claim. 121 S.Ct. at 2463. Justice O'Connor concurred and explained that the time of ownership should inform the Court's investment-backed expectation analysis and should not bar the claim of Mr. Palazzolo even though his corporation (and not Mr. Palazzolo) was the owner of the property on the effective date of the regulation. 121 S.Ct. at 2465–2466. Justice Scalia would go even further. In his "view, the fact that a restriction existed at the time the purchaser took title ... should have no bearing upon the determination of whether the restriction is so substantial as to constitute a taking.... [He further stated that a] ... taking ... is not absolved by the transfer of title." 121 S.Ct. at 2468. He reasoned that a taking is a constitutional claim that affects owners of land, and would not let the passage of title bar that claim.

Accordingly, a majority of the U.S. Supreme Court has held that the *Palazzolo* transfer of ownership, which occurred as a matter of law and transferred ownership from a corporation to an individual after the effective date of the regulation, did not prevent the individual from asserting a takings claim. A similar result should follow in this case. Consequently, we hold that where ownership of the Erickson property transferred from one trust to another with no new beneficiaries and where the regulation did not authorize a physical invasion of private property, the change in ownership does not divest Erickson of standing to assert its takings claim.

## Takings Analysis

The problem of balancing governmental power to regulate the permissible uses of private property with individual property rights is not a new one, but it is a problem that has not been solved despite multiple attempts to formulate a rule that would apply in all situations. The U.S. Supreme Court recognized that it has:

quite simply ... been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated

by the government, rather than remain disproportionately concentrated on a few persons.

*Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. Nevertheless, our Opinions and the Opinions of the U.S. Supreme Court have set forth some guiding principles.[7]

If a regulation authorizes a physical invasion of private property, no matter how slight, the U.S. Supreme Court has consistently concluded that a taking has occurred. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 422, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding that a New York law requiring building owners to permit cable companies to install cable facilities on their premises constituted a taking). Clearly, "[a] taking may more readily be found when the interference with property can be characterized as a physical invasion by government[.]" *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646.

In this case, we are not unsympathetic to the claim of Property Owners that the regulation "had the same effect as if the Commonwealth had mined the coal and hauled it away." Property Owners' Main Brief at 13. The reality is, however, that the regulation did not authorize the removal of any coal or any physical invasion of or access to their land. Indeed, as this Court explained in *Commonwealth v. Plymouth Coal Co.,* 232 Pa. 141, 81 A. 148 (1911), *aff'd,* 232 U.S. 531, 34 S.Ct. 359, 58 L.Ed. 713 (1914), requiring landowners to leave coal in the ground is not the equivalent of an appropriation of that coal. *Plymouth Coal,* 81 A. at 151. In holding that the statute at issue in *Plymouth Coal* did not constitute a taking, we said:

7. This Court has consistently relied upon the decisions of the U.S. Supreme Court when considering takings issues. We have stated:

[a]n examination of our caselaw reveals that this Court has continually turned to federal precedent for guidance in its "taking" jurisprudence, and indeed has adopted the analysis used by the federal courts.

*United Artists' Theater Circuit, Inc., v. City of Philadelphia,* 535 Pa. 370, 635 A.2d 612, 616 (1993) (upholding a Philadelphia historic landmark ordinance, this Court applied *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991) test and held that, with regard to a landmark designation, the takings clause in the Pennsylvania Constitution does not provide more extensive protections than those offered by the U.S. Constitution).

The coal itself is not taken. The property right affected by the statute is not ownership, but use, of the material thing— the right to mine it out. Nor does the state take that right for public use. The act does not transfer the right to mine out the coal from the owner to some one else, for the public benefit, but prohibits that right from being exercised by anyone....

*Id.*[8]

■ Furthermore, not all regulations that affect private property require the government to purchase the land in order to regulate its permissible uses. Indeed, the government would quickly bankrupt itself if, every time it made a rule that affected private property rights, it had to purchase the property. *Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 491, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). The U.S. Supreme Court has explained the utilitarian philosophical basis for permitting government to enact legislation that affects private property rights as follows:

Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others. These restrictions are properly treated as part of the burden of common citizenship.... [T]he Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.

*Id.* (internal citations omitted). Indeed, in this case we are mindful of the potential for extended litigation and extraordinary cost to the Commonwealth if compensation is required for all UFM designations.[9] The often repeated maxim that

8. At issue in *Plymouth Coal* was the Anthracite Mining Act, Act of June 2, 1981, P.L. 183, *as amended,* 52 P.S. § 264 (repealed 1965), which required owners of adjoining mines to maintain a coal barrier between the mines. We held that the statute did not violate the takings clause of the Pennsylvania Constitution. *Id.* 81 A. at 151, 152.

9. In addition to the instant UFM designation, the Commonwealth has designated sixteen other areas as UFM. *See* 25 Pa.Code § 86.130 b(1)-(17).

"[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law" rings truer today than ever. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

We have also recognized that the government may enact laws that have significant impact on private property rights without the need to compensate the affected landowner. *Miller & Son Paving, Inc. v. Plumstead Township*, 552 Pa. 652, 717 A.2d 483 (1998), *cert. denied*, 525 U.S. 1121, 119 S.Ct. 903, 142 L.Ed.2d 902 (1999). In *Miller*, we held that a landowner was not entitled to payment from the township that had prevented the operation of a quarry because "other viable uses [of the land] existed." *Id.* at 486. We explained, "that a taking does not result merely because a regulation ... deprive[s] the owner of the most profitable use of his property. Otherwise all zoning regulations could be categorized as 'takings' in the sense that the owner is not completely free to use his property as he chooses." *Id.* at 486. Our view is consistent with repeated holdings of the U.S. Supreme Court:

> It is, to be sure, undeniable that the regulations here prevent the most profitable use of appellees' property. Again, however, that is not dispositive. When we review regulation[s], a reduction in the value of property is not necessarily equated with a taking.

*Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (reviewing federal statute prohibiting the sale of products derived from eagles even if obtained before the statute's enactment); *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646 (discussing landmark designation that prohibited construction of building over New York's Grand Central Station); *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (examining application of town ordinance that prohibited a land owner from operating a sand and gravel pit notwithstanding that he had, for thirty-five years prior to the ordinance, used the land for that purpose); and *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928)

(reviewing order requiring the removal of cedar trees to protect neighboring apple orchards from disease).

Although none of the foregoing governmental actions were found to constitute a taking, at some point, a regulation "goes too far." *Pennsylvania Coal Co.,* 260 U.S. at 415, 43 S.Ct. 158. A regulation goes too far when it forces "some people alone to bear public burdens which in all fairness and justice should be borne by the public as a whole." *Palazzolo,* 121 S.Ct. at 2458 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). This fairness and justice standard, although amorphous, necessarily guides our analysis.

### The Standards: the Lucas Test and the Traditional Takings Analysis

In non-appropriation/non-physical invasion cases, the U.S. Supreme Court applies two tests to determine whether a taking has occurred. *Palazzolo,* 121 S.Ct. at 2457. The first test addresses the "relatively rare" situation in which a land use regulation deprives the owner of all use of his or her property. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1017, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The second "test" is the more traditional takings analysis, which becomes applicable if the regulation does not rise to the level of a *Lucas* taking. The U.S. Supreme Court explained that:

> [A] regulation which "denies all economically beneficial or productive use of land" will require compensation under the Takings Clause. *Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886.... Where, [however] a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending upon a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. *Penn Central,* [438 U.S.] at 124, 98 S.Ct. 2646.

*Palazzolo,* 121 S.Ct. at 2457. The U.S. Supreme Court has recently described this second test as an analysis pursuant to

"the principles set forth in *Penn Central*." *Palazzolo,* 121 S.Ct. at 2457 (internal citation omitted) (remanding consideration of a land use regulation—that did not rise to the level of a *Lucas* taking—to the Rhode Island Supreme Court for further proceedings consistent with *Penn Central*).

We will analyze this case based on the foregoing framework. First, we ask whether the regulatory action " 'denies [the Property Owners of] all economically beneficial or productive use of land.' " *Palazzolo,* 121 S.Ct. at 2457 (quoting *Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886). If it does, unless the use constitutes a nuisance, we will find that a taking has occurred. If not, we will consider whether, at this juncture, it is appropriate for this Court to undertake the *Penn Central* analysis.

### Takings Denominator

Pursuant to either analysis, there is a threshold question, frequently referred to as the "denominator problem," which must be answered: what is the parcel against which the takings tests are applied? *See Keystone,* 480 U.S. 470 at 479, 107 S.Ct. 1232, 94 L.Ed.2d 472. For if we define the area broadly, almost no government action—no matter how intrusive—will be found to be a taking. *See* John E. Fee, *Unearthing the Denominator in Regulatory Takings Claims,* 61 U. Chi. L.Rev. 1535, 1536 (1996). Similarly, if we define the land too narrowly, virtually all government action that affects private property will be a taking that requires compensation and government will be inhibited from enacting necessary legislation. *Id.*

Because property is conceptualized as a "bundle" of "property rights", *see Loretto v. Teleprompter Manhattan CATV, Corp.,* 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), courts have had to struggle with what has been referred to as "severance" issues in defining the relevant parcel. See Marc R. Lisker, *Regulatory Takings and the Denominator Problem,* 27 Rutgers L.J. 663, (Spring 1966) ("the Lisker Article"). In other words, the courts have been called upon to consider whether some of the property rights in the bundle may be severed from the others and viewed separately as the relevant

parcel. Severance issues have involved the following: (1) the horizontal, physical division of property—is the relevant parcel all the land in a given geographic area that one owns or some smaller portion of that acreage, *Florida Rock Industries v. United States,* 791 F.2d 893 (Fed.Cir.1986); (2) the vertical division of property—can the parcel be divided among air rights, surface rights, and mineral rights, *Penn Central,* 438 U.S. at 130, 98 S.Ct. 2646 and *Keystone,* 480 U.S. at 470, 107 S.Ct. 1232; or (3) the temporal division of property—can the property be viewed in discrete temporal units, *Tahoe–Sierra Pres. Council Inc. v. Tahoe Reg. Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

Resolving the denominator problem profoundly influences the outcome of a takings analysis. Again, the more narrowly the relevant parcel is defined, the more likely is the finding of a taking under either test, and vice versa. *See Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1180 (Fed.Cir. 1994). In this case, defining the relevant parcel raises horizontal and vertical severance issues.

### Vertical Conceptualization of Property

The U.S. Supreme Court has expressly rejected Pennsylvania's division of estates within a single parcel of land for the purposes of takings analysis. *Keystone,* 480 U.S. at 479–480, 500, 107 S.Ct. 1232 (citing *Andrus* ). Specifically, the Court stated:

Pennsylvania property law is apparently unique in regarding the support estate as a separate interest in land that can be conveyed apart from either the mineral estate or the surface estate. Petitioners therefore argue that even if comparable legislation in another State would not constitute a taking, the Subsidence Act has that consequence because it entirely destroys the value of their unique support estate. **It is clear, however, that our takings jurisprudence forecloses reliance on such legalistic distinctions within a bundle of property rights.**

*Keystone,* 480 U.S. at 500, 107 S.Ct. 1232 (emphasis added).[10]
Accordingly, the U.S. Supreme Court held that the property
as a whole was the unit of inquiry.

Similarly, in *Penn Central,* where the city's landmark ordi-
nance prohibited Grand Central Station from constructing an
office building over the station, the Court refused to separate
surface rights from air rights. The Court explained:

> **"Taking" jurisprudence does not divide a single property
> into discrete segments and attempt to determine wheth-
> er rights in a particular segment have been entirely
> abrogated.** In deciding whether a particular governmental
> action has effected a taking, this Court focuses ... on the
> nature and extent of the interference with rights in the
> parcel as a whole—here the city tax block designated as the
> landmark site.

*Penn Central,* 438 U.S. at 130–131, 98 S.Ct. 2646 (emphasis
added; internal quotations omitted).

Notwithstanding the clear rejection by the federal high
court of Pennsylvania's division of estates, the U.S. Supreme
Court, until recently, has left room for doubt as to whether the
Court would always apply the "property as a whole" rule. In
a footnote, and admittedly in *dictum,* the *Lucas* court ob-
served that when a regulation's interference with the use of
property approaches, but does not reach, the level where 100%
of a portion of property is made valueless, "it is unclear"
whether the Court would view the regulation as an impermis-
sible deprivation of the portion or an appropriate "diminution
in the property as a whole." *Lucas,* 505 U.S. at 1016–1017, n.
7, 112 S.Ct. 2886.

While the holdings of the U.S. Supreme Court have consis-
tently supported the use of the "property as a whole" rule, the
footnote in *Lucas* and the following statement in *Palazzolo*

**10.** The Supreme Court affirmed the Third Circuit's determination that:

> To focus upon the support estate separately when addressing the
> diminution of the value of plaintiffs' property caused by the Subsi-
> dence Act therefore would serve little purpose. The support estate is
> more properly viewed as only one "strand" in the plaintiff's "bundle"
> of property rights, which also includes the mineral estate.

*Keystone,* 480 U.S. at 480, 107 S.Ct. 1232.

demonstrate that at least some members of the Court have misgivings about whether to apply that test in all situations. The Court recently addressed the issue of the appropriate property for takings analysis as follows:

[Petitioner] argues, for the first time, that the upland parcel is distinct from the wetlands portions, so he should be permitted to assert a deprivation limited to the latter. This contention asks us to examine the difficult, persisting question of what is that proper denominator in the takings fraction. . . . Some of our cases indicate that the extent of deprivation effected by a regulatory action is measured against the value of the parcel as a whole, *see, e.g. Keystone,* 480 U.S. at 497, 107 S.Ct. 1232; but we have at times expressed discomfort with the logic of this rule, *see Lucas,* 505 U.S. at 1016–1017, n. 7, 112 S.Ct. 2886, a sentiment echoed by some commentators, *see, e.g.,* Epstein, *Takings: Descent and Resurrection,* 1987 SUP.CT. REV. 1, 16–17 (1987); Fee, *Unearthing the Denominator in Regulatory Takings Claims,* 61 U. CHI. L.REV. 1535 (1994). Whatever the merits of these criticisms, we will not explore the point here. Petitioner did not press the argument in the state courts, and the issue was not presented in the petition for certiorari. The case comes to us on the premise that petitioner's entire parcel serves as the basis for this takings claim, and, so framed, the total deprivation argument fails.

*Palazzolo,* 121 S.Ct. at 2465 (internal citations modified and/or omitted). Notwithstanding the Court's misgivings, it declined to accept the invitation of Palazzolo to overrule the "property as a whole" rule. *Id.,* 121 S.Ct. at 2448. While the Court explained that it viewed the property as a whole because, at all times before the briefing of the case the parties discussed the property as a single parcel; the Court also did not overrule *Keystone* or *Penn Central.* Instead, the Court viewed the property as a whole and determined that there had been no *Lucas* taking. *Palazzolo,* 121 S.Ct. at 2465. Nevertheless, the *Lucas* footnote and the statement in *Palazzolo* have made clear that some members of the Court have retreated from the

absolute application of the "property as a whole" rule. *Lucas,* 505 U.S. at 1016–1017, n. 7, 112 S.Ct. 2886.

Notwithstanding the foregoing misgivings of some members of the U.S. Supreme Court, that Court recently reaffirmed the validity of the property as a whole rule. *Tahoe–Sierra Preservation Council v. Tahoe Reg. Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 1480–81, 152 L.E.2d 517 (2002). In *Tahoe–Sierra,* Petitioners sought to divide their interests in land into temporal parts to claim that the statute, which imposed a temporary moratorium on development of private property surrounding Lake Tahoe, caused the restricted temporal portion of their property to become valueless. *Id.* at 1482–83. The Court declined to allow Petitioners to so divide their property. *Id.* It held that the moratorium did not constitute a *Lucas* taking because a fee simple interest in property may not be temporally divided for the purpose of takings analysis. *Id.* at 1482–84. The Court held that, when viewed as a whole the properties at issue retained value and that the temporary development prohibition did not rise to the level of a *Lucas* taking. The Court explained:

> Petitioners' "conceptual severance" argument is unavailing because it ignores *Penn Central's* admonition that in regulatory takings cases we must focus on "the parcel as a whole." We have consistently rejected such an approach to the "denominator" question.... Thus, the District Court erred when it disaggregated petitioners' property into temporal segments corresponding to the regulations at issue and then analyzed whether petitioners were deprived of all economically viable use during each period....

*Id.* at 1482–84 (internal citations omitted). Following *Tahoe–Sierra,* there can be no dispute that the "property as a whole" rule remains controlling.

As we have noted above, the U.S. Supreme Court has not instructed conclusively how the denominator problem should be resolved. However, that Court has refused to allow: vertical severance of the mineral estate in *Keystone;* vertical segmentation of air and surface rights in *Penn Central;* or temporal division of property in *Tahoe–Sierra.* Thus, in this

case, the relevant parcel cannot be vertically segmented and must be defined to include both the surface and mineral rights.

## Horizontal Conceptualization of Property

■■■ We now address the manner in which the property of the Property Owners is to be horizontally defined. The Commonwealth Court selected the coal estates in the UFM area as the property at issue and disregarded surface rights and all other geographic areas. In contrast, the Commonwealth parties argued in favor of using all of the Property Owners' property in Clearfield County. It seems that the selection of the Commonwealth is overly inclusive and the selection of Property Owners and the Commonwealth Court is overly restrictive. It is difficult to imagine that either rule would prove satisfactory in all cases. Instead, we adopt a "flexible approach, designed to account for factual nuances". *Loveladies Harbor*, 28 F.3d at 1181. Pursuant to this approach, a variety of factors for defining the relevant parcel should be considered, without making one factor more important than any other. These factors would include, but would not be limited to: unity and contiguity of ownership, the dates of acquisition, the extent to which the proposed parcel has been treated as a single unit, the extent to which the regulated holding benefits the unregulated holdings; the timing of transfers, if any, in light of the developing regulatory environment; the owner's investment backed-expectations; and, the landowner's plans for development. *Id. See also Florida Rock Industries*, 791 F.2d at 893; *District Intown Properties Ltd. Partnership v. District of Columbia*, 198 F.3d 874 (D.C.Cir. 1999). However, because all of these factors are not part of the record, we remand to the Commonwealth Court for it to have the responsibility of considering the relevant facts and identifying the appropriate horizontal conceptualization of the property to use in both the *Lucas* and *Penn Central* analyses.

## Lucas Analysis

■■■ We now turn to the *Lucas* test and a consideration of the issue concerning whether *Lucas* requires a finding that

a taking has occurred. *Lucas* stands for the proposition that regulations that deprive an owner of "all economically beneficial or productive use of land" are takings unless the use constitutes a public nuisance or are caused by the nature of the use and the owner could have expected that the government might prohibit it. *Lucas*, 505 U.S. at 1027–1029, 112 S.Ct. 2886. Therefore, to conduct a *Lucas* analysis, we need to determine whether the subject regulation "deprives a landowner of all economically beneficial" use of his or her property. If so, the regulation will constitute a taking unless state property law independently prohibits the use. *Id.* at 1027, 112 S.Ct. 2886.

Property Owners conceptualize this case as a *Lucas* categorical taking. They claim that because they own coal estates in the UFM area and are not permitted to mine that coal, all of their interest in the land has been taken. The Commonwealth Court implicitly agreed when it decided to use the coal estates within the UFM area as the property affected by the regulation. *Machipongo IV*, 719 A.2d at 29. That court explained that it used the coal estate because Pennsylvania recognizes three separate estates in the same piece of land: surface, coal/mineral, and support. It reasoned that because the estates in land may be separated for purposes of ownership, the coal estate could be separated from the whole to determine whether a taking had occurred.

As we have stated, though, the relevant parcel must be defined to include both the surface and mineral rights of the parties. We also have remanded the determination of the appropriate horizontal extent of the properties to the Commonwealth Court. Nevertheless, and notwithstanding the limited information available, we can perform the *Lucas* analysis with regard to the Machipongo property and identify the relevant *Lucas* issues concerning the property of the Naughton/Erickson property owners.

To do so, we return to a consideration of the property owned by the Property Owners. Machipongo owns 373 acres in fee simple within the UFM area and 1000 acres outside of

the UFM area. (R. 260). Within the UFM area, Machipongo owns surface rights as well as mineral rights. The regulation, therefore, does not "deprive ... [it] of all economically beneficial" use of its property (*Lucas*, 505 U.S. at 1027, 112 S.Ct. 2886) because Machipongo admits that it benefits from its surface rights by selling timber (R. 262a) and entering into leases for gas development. (R. 263a). Further evidence of the value of the Machipongo surface estate is clear from the record. Specifically, in 1994, in what Machipongo contends was a "forced sale", Machipongo received $60,000 for 35.93 acres of its property. (R. 47a). It, therefore, appears that if Machipongo sold the remaining 373 acres of undeveloped land within the UFM area, at the same price per acre as the 1994 sale, it would earn, in 1994 dollars, at least $622,878. Clearly, the regulation does not deny Machipongo "all economically beneficial" use of its property. Accordingly, we find that the regulation, as it relates to Machipongo, passes the *Lucas* test. *Lucas*, 505 U.S. at 1027, 112 S.Ct. 2886.

██ Inconsistent factual information regarding the property of the Naughton/Erickson Property Owners requires us to remand the case for the *Lucas* analysis regarding their property. As far as we are able to determine, their property includes a coal estate of fifty-two acres within the UFM area and fee simple title to 1,150 acres and 250 acres of coal estate situated outside of the UFM area. (R. 260a). Based on the briefs and the record, it appears that within the UFM area the Naughton/Erickson Property Owners own only coal estates and do not own surface rights in the UFM area. This would appear to distinguish them from the Machipongo Property Owners. However, contrary to that understanding, the Commonwealth Court refers to the Property Owners' surface rights in the UFM area. Specifically, it explains:

Because we have determined that only the regulated land is to be considered in determining the denominator, **we must next determine how to treat [Property] Owners' coal estate in the UFM designated area. The Commonwealth suggests we should calculate the denominator based on finding [Property] Owners' rights in the coal estate are**

just part of the bundle of rights they own in land. If we were to do so, there would be no taking because [Property] Owners do not dispute that they still have surface rights that can be used and they would not be deprived of all economical beneficial use of their land. If, however, we were to agree with [Property] Owners that it did not matter what other estates in land they owned because the coal estate was treated as a separate estate, then there would be a taking because they would be deprived of their right to mine that land.

*Machipongo IV,* 719 A.2d at 28 (emphasis added). Because we are unsure whether the Naughton/Erickson Property Owners own surface rights within the UFM area, and because the Commonwealth Court has not yet defined the limits of the horizontal extent of the property of the Naughton/Erickson Property Owners, which may or may not be greater than the UFM area, we are unable to properly conduct a *Lucas* analysis with regard to them. We, therefore, remand the *Lucas* determination to the Commonwealth Court to render a decision consistent with this Opinion.

### Traditional Takings Analysis

Because the regulation, as to Machipongo (and possibly to Naughton/Erickson Property Owners as well) survives *Lucas,* a traditional takings analysis must be performed. *See Palazzolo,* 121 S.Ct. at 2457. The traditional analysis focuses on several criteria designed to balance public interest against private rights. In *Penn Central,* the U.S. Supreme Court set forth the factors as follows:

> The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations[; [11]]

* * * *

11. We note with approval that Justice O'Connor, in her *Palazzolo* Concurring Opinion, observed that an evaluation of the reasonableness of a claimant's investment-backed expectations should take into consideration whether the land owner owned the property on the effective date of the regulation as well as the "regulatory regime in place at the time the claimant acquires the property ... [that is, the extent of

The character of the governmental action ... [whether there is a] physical invasion ... [or whether the regulation is reasonably related to the promotion of the general welfare; and,]

\* \* \* \*

 [Whether] the health, safety, morals, or general welfare would be promoted by prohibiting particular contemplated uses of land.

*Penn Central,* 438 U.S. at 124, 125, 98 S.Ct. 2646. It is the task of a court performing a traditional takings analysis to determine whether the regulation, based on the foregoing considerations, is unduly oppressive and forces "some people alone to bear public burdens which in all fairness and justice should be borne by the public as a whole." *Palazzolo,* 121 S.Ct. at 2458 (quoting *Armstrong v. United States,* 364 U.S. at 49, 80 S.Ct. 1563 (1960)).

In the context of the summary judgment motion, the Commonwealth Court did not conduct a full *Penn Central* takings analysis. *Machipongo IV,* 719 A.2d at 29. Instead, it focused on the coal estates in the UFM area and relied predominantly on the takings equation. Indeed, the purpose of the trial was limited to the issue of whether the coal estates could be profitably mined. *Machipongo VI,* 719 A.2d at 25–26.

 The U.S. Supreme Court determined that although the regulation at issue in *Palazzolo* did not rise to the level of a *Lucas* taking (because the property, when viewed as a whole, retained value), it remanded the case to the Rhode Island Supreme Court for a determination of whether a *Penn*

previous government regulation of the area]." *Palazzolo,* 121 S.Ct. at 2466.

Consistent with the observation that the regulatory regime at the time the claimant acquires property is relevant to the inquiry, we have observed that:

The Legislature has long regulated the quality of the waters in the Commonwealth.... In addition, ... Congress, ha[s] ... made extensive efforts to remove the pollution from our nation's waters. *National Wood Preservers, Inc. v. Commonwealth,* 489 Pa. 221, 414 A.2d 37, 44 (1980) (citations omitted).

*Central* taking had occurred. *Palazzolo*, 121 S.Ct. at 2457.[12] While some evidence relevant to the traditional takings analysis was adduced during the trial in the instant case, to determine whether the UFM area could be economically mined, the relevant facts were never presented to the Commonwealth Court for the purpose of conducting a traditional takings analysis. Subject to the issue of nuisance, which we address in the next section, we believe that the Commonwealth Court should conduct a trial to consider the facts relevant to the determination of whether the regulation is a taking pursuant to the traditional takings analysis.

## Nuisance

The Commonwealth Court prevented the Commonwealth from presenting evidence regarding whether the proposed use of the land would constitute a nuisance. *Machipongo V*, slip op. at 2. Notwithstanding that the Commonwealth Court recognized that "polluting the waters of the Commonwealth is a public nuisance[,]" it declined to consider the Commonwealth's evidence that the proposed use would constitute a nuisance. *Id.* at 7. The Commonwealth Court explained that the water was adequately protected by PaSMC-RA regulations that require applicants for permits to show that there is no presumptive evidence that mining would pollute surrounding waters. *Id.* However, regardless of the protections offered in those regulations, there is nothing that prevents the state from enacting a law that makes explicit its right to prohibit activity, which would already be contrary to existing law. *See Lucas*, 505 U.S. at 1030, 112 S.Ct. 2886.

Furthermore, it is clear that if a regulation prohibits behavior that could be abated or prohibited by general principles of state property law, there is no need for the state to provide compensation to prevent the use. *Id.* at 1027–1029, 112 S.Ct. 2886. In *Lucas*, the U.S. Supreme Court explained

12. Upon the U.S. Supreme Court's remand of the *Penn Central* takings analysis, the Rhode Island Supreme Court, in turn, remanded the case to its Superior Court to conduct the analysis. *Palazzolo v. State ex rel. Tavares*, 785 A.2d 561 (R.I.2001).

that even where the regulation prohibits "all economically beneficial use of land," there is no taking if the use could be abated or prohibited by general principles of state property law. *Id.* at 1029, 112 S.Ct. 2886. That is to state,

[i]n light of our traditional resort to "existing rules or understandings that stem from an independent source such as state law" to define the range of interests that qualify for protection as "property" under the Fifth and Fourteenth Amendments, this recognition that the Takings Clause does not require compensation when an owner is barred from putting land to a use that is proscribed by those "existing rules or understandings" is surely unexceptional.

*Id.* at 1030, 112 S.Ct. 2886 (internal citations omitted). In fact, the U.S. Supreme Court remanded *Lucas* to the South Carolina Supreme Court and directed it to determine whether, pursuant to state law, the prohibited use constituted a nuisance or violated state property law. *Id.*

The rules and understandings as to the uses of land that are acceptable and unacceptable have changed over time. The fact that sewage was once strewn into city streets does not give rise to a permanent reasonable expectation that such behavior can continue indefinitely. In another takings case, the U.S. Supreme Court explained this concept as follows:

It is true, when the defendants ... purchased or erected their breweries, the laws of the state did not forbid the manufacture of intoxicating liquors. But the state did not thereby give any assurance, or come under an obligation, that its legislation upon that subject would remain unchanged. Indeed, ... the supervision of the public health and the public morals is a governmental power, continuing in its nature, and to be dealt with as the special exigencies of the moment may require; and that, for this purpose, the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself.

*Mugler v. Kansas,* 123 U.S. 623, 669, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (internal citations and quotations omitted) (holding that a state statute that prohibited manufacture of alcoholic beverages was not a taking even though such manufacture was legal

before the statute). While the owner of land might once have been permitted to mine his land without regard to the effect that it had on public streams, as evidenced by the spoilage of "11,000 miles of streams" in this country,[13] that expectation is, and has been for some time, no longer reasonable. Despite the fact that one may have purchased property with the expectation to use it in such a manner that was acceptable before the purchase, there may come a point in time when the original owner's expectations may no longer be reasonable.

The Commonwealth Court has repeatedly applied Section 821B of the Restatement (Second) of Torts to guide its determinations as to whether a use of property constitutes a public nuisance. *See, e.g., Muehlieb v. City of Philadelphia,* 133 Pa.Cmwlth. 133, 574 A.2d 1208 (1990). That Restatement section provides as follows:

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B. Therefore, the issue is whether the proposed mining would unreasonably interfere with a right of the general public.

▆▆▆ Reasonableness is essentially a factual inquiry, which we will not address, but whether there is public right, is an

---

**13.** *Hodel v. Virginia Surface Mining and Reclamation Association, Inc.,* 452 U.S. 264, 279–280, 101 S.Ct. 2352 (1981) (quoting 1976 & 1977 U.S. House of Representatives reports, discussed *infra.*)

issue of law. This Court has expressly held that the public has a right not to suffer acid mine discharge into its public waters, and that such discharges constitute a public nuisance as a matter of statutory and common law. *Commonwealth v. Barnes & Tucker Co.*, 455 Pa. 392, 319 A.2d 871, 880 (1974) (*Barnes & Tucker I* ). In *Barnes & Tucker I*, we reversed a decision of the Commonwealth Court that rejected the Commonwealth's nuisance causes of action. We held that common law authorized the abatement of acid mine drainage that pollutes public waters. *Id.* at 881–882. We also observed that The Clean Stream Law, 35 P.S. § 691.1 et seq., provides a statutory basis for the finding that acid mine discharge may rise to the level of a public nuisance.

> The discharge of sewage or industrial waste or any substance into the waters of this Commonwealth, which causes or contributes to pollution as herein defined or creates a danger of such pollution is hereby declared not to be a reasonable or natural use of such waters, to be against public policy and to be a public nuisance.

*Barnes & Tucker I,* 319 A.2d at 880 (quoting section 3 of The Clean Streams Law, Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. § 691.3). In reaching that conclusion, we relied on *Pennsylvania R.R. Co. v. Sagamore Coal Co.,* 281 Pa. 233, 126 A. 386 (1924), where we granted an injunction to prevent mine owners from discharging acid mine water into a stream used by the railroad and the public as a water supply. *Id.* at 387. We stated: "[i]t has always been under our law, a nuisance to pollute a stream from which the public gets its supply of water." *Id.* at 391. The General Assembly's definition of pollution, although circular for our purposes in that it uses the word nuisance, provides useful guidance. Section 1 of The Clean Streams Law, 35 P.S. § 691.1. The Section defines pollution as follows:

> **"Pollution"** shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultur-

al, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. . . .

35 P.S. § 691.1.

There is further statutory support for a finding that it is against the law of this Commonwealth and a nuisance to pollute public waters in section 401 of the Clean Streams Law, 35 P.S. § 691.401, which provides that:

It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance.

In *Barnes & Tucker I,* we repeated that "corruption of water which affects the public use of a stream or menaces the public health becomes a public nuisance which the Commonwealth may seek to abate." *Barnes & Tucker I,* 319 A.2d at 882.[14]

The Commonwealth Court, therefore, incorrectly held that there was no authority that would permit the Commonwealth to prohibit a property owner from mining just because it would destroy the population of trout in Goss Run. *Machipongo V,* slip op. at 7. While the Commonwealth contends that mining would, in addition to destroying the trout population, adversely affect the use of the stream as a water supply (R.3a) the nature of the public use of the water should not be the

14. Similarly, upon our review of the Commonwealth Court's abatement order we held,

[G]iven our determination that the Commonwealth is validly employing its police power in a reasonable manner to abate the immediate public nuisance, there can be no finding of an unconstitutional "taking" by the imposition of the present abatement order. . . .

*Commonwealth v. Barnes & Tucker Co.,* 472 Pa. 115, 371 A.2d 461, 467 (1977) (*Barnes & Tucker II* ).

focus of our inquiry. To the contrary, we have explained that "we believe that the public has a sufficient interest in clean streams alone regardless of any specific use thereof ... [to warrant] injunctive relief." *Barnes & Tucker I*, 319 A.2d at 882 (preserving the water from acid mine runoff despite the fact that the only use of the water was recreational). Accordingly, if the Commonwealth is able to show that the Property Owners' proposed use of the stream would unreasonably interfere with the public right to unpolluted water, the use, as a nuisance, may be prohibited without compensation.

Property Owners correctly point out that in the past we have held that if a nuisance is only anticipated and not a nuisance *per se,* the party seeking to prevent the use must show that the nuisance is "practically certain [to occur], not merely probable." *Ranck v. Bonal Enterprises, Inc.,* 467 Pa. 569, 359 A.2d 748, 752 (1976). However, although mining is not a nuisance *per se,* pollution of public waterways is. The key to protecting our water is to prevent pollution from occurring. The General Assembly has expressly stated that not only is its desire to restore polluted waters but "[i]t is the objective of the Clean Streams Law ... to **prevent** further pollution of the waters of the Commonwealth." 35 P.S. § 691.4(3) (emphasis added). It is beyond dispute that the resources needed to correct pollution once it has occurred are far greater than those needed to prevent it. While it is true that mining *per se* is not a nuisance, experts need not wait until acid mine water flows out of mines in the UFM area to predict the likely results of mining this land. If the Property Owners are correct that additional mining would not pollute the Watershed, then there is no nuisance. Then again, if the Commonwealth can prove that mining the UFM area would pollute Goss Run, the cause of the nuisance can be prohibited. We see no reason to require the Commonwealth to prove that the alleged pollution is practically certain to occur. It is enough if the Commonwealth can prove what its technical study found, that further mining in the UFM area had a "high potential to cause increases in dissolved solid and metal concentrations in Goss Run that would adversely affect the use of

the stream as an auxiliary water supply" or had "a significant potential to disrupt the hydrologic balance causing decreases in the net alkalinity of discharges ... and destroying the habitat for wild trout populations." *Machipongo VI,* 719 A.2d at 21.

■ Therefore, we remand this case to the Commonwealth Court to consider evidence that the proposed use would constitute a nuisance. If, after a factual inquiry that court determines that the Property Owners' activities would unreasonably interfere with the public right to unpolluted water, the ruling of the court based upon decisions of this Court and the U.S. Supreme Court should be clear. *Lucas,* 505 U.S. at 1027–1029, 112 S.Ct. 2886; *Barnes & Tucker I,* 319 A.2d at 881–882. The government is not required to pay Property Owners to refrain from taking action on their land that would have the effect of polluting public waters. Indeed, despite our conviction that private property rights are to be strongly protected, we are struck by the impropriety of taking action that would require the General Assembly to pay someone not to pollute public water or destroy public fisheries.

### Conclusion

We, therefore, reverse the Commonwealth Court's determination that a taking occurred and remand this case to the Commonwealth Court to: (1) horizontally define the relevant property: (2) conduct the *Lucas* analysis with regard to the property of the Naughton/Erickson Property Owners; (3) conduct the *Penn Central* analysis with regard to the property of both Property Owners; and, if necessary, (4) determine whether the proposed use would constitute a nuisance or would otherwise violate state property law.

We do accept, however, the Commonwealth Court's determination that property without value cannot be taken. The Commonwealth Court considered detailed scientific evidence of the economic viability of mining coal in the UFM area and determined that "the Machipongo Surface Mine ... [was] not economically feasible." *Machipongo VI,* slip op. at 38. There-

fore, the Commonwealth Court declined to find a taking with regard to the Machipongo Surface Mine. The Commonwealth Court's legal reasoning on this issue is sound and there is no basis here to alter its factual findings. Accordingly, the Property Owners are not entitled to compensation with regard to the Machipongo Surface Mine.

Finally, Property Owners have requested that we identify the appropriate forum for a hearing on damages. However, because we have reversed the determination of the Commonwealth Court that a taking occurred and because it is not clear, at this juncture, whether a taking will be found, we decline to render an advisory opinion as to the appropriate forum to consider damages.

Former Chief Justice FLAHERTY did not participate in the decision of this case.