J-A18005-25          2026 PA Super 36

| | | |
|---|---|---|
| CVS PHARMACY, INC., CVS RX SERVICES, INC., CVS INDIANA, L.L.C., PENNSYLVANIA CVS PHARMACY L.L.C, ALBERTSON'S LLC, AND ACME MARKETS, INC. | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : : : | No. 3093 EDA 2024 |
| THE CITY OF PHILADELPHIA, PENNSYLVANIA | : : : | |

Appeal from the Order Entered July 24, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  210902183

BEFORE:   OLSON, J., BECK, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY OLSON, J.:                    **FILED FEBRUARY 27, 2026**

Appellants, CVS and Albertsons (hereinafter "the Appellant Pharmacies"),[1] appeal by permission from the interlocutory order entered on July 24, 2024, which overruled their preliminary objections.  We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The appellate entities which are identified as "CVS" are CVS Pharmacy, Inc., CVS Rx Services, Inc., CVS Indiana, L.L.C., and Pennsylvania CVS Pharmacy L.L.C.; the appellate entities which are identified as "Albertson's" are Albertson's LLC and ACME Markets, Inc.

In 2021, the City of Philadelphia ("the City") filed a complaint against the Appellant Pharmacies.[2]  According to the complaint, the Appellant Pharmacies are engaged in the business of "distribut[ing] and dispens[ing] prescription opioids throughout the United States, including in the City."  The City's Complaint, 9/28/21, at ¶¶ 35-60.  Most prescription opioids are identified as "Schedule II" controlled substances and are heavily regulated under Pennsylvania law.[3]  *Id.* at ¶ 11; *see also* 35 P.S. § 780-104(2).  By definition, a Schedule II controlled substance is one that has "a high potential for abuse, currently accepted medical use in the United States, or currently accepted medical use with severe restrictions, and abuse may lead to severe psychic or physical dependence."  35 P.S. § 780-104(2).

Under Pennsylvania law, the Appellant Pharmacies "are subject to various duties to report the quantity of Schedule II controlled substances in order to monitor such substances and prevent oversupply and diversion into the illicit market."  The City's Complaint, 9/28/21, at ¶ 72.  The Appellant Pharmacies also have "several responsibilities under Pennsylvania law . . . to

---

[2] The City filed its complaint against a number of other defendants.  The other defendants either settled or declared bankruptcy, leaving the Appellant Pharmacies as the only remaining defendants in this case.

[3] These prescription opioids include hydrocodone and oxycodone.  *See* 35 P.S. § 780-104(2)(i)(1).  Illicit opioids, such as heroin, cannot be prescribed, as these types of opioids are defined as "Schedule I" controlled substances.  *See* 35 P.S. § 780-104(1)(ii)(10); *see also* 35 P.S. § 780-104(1) (defining a "Schedule I" controlled substance as one that has:  "a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision").

control [] the supply chain of opioids." *Id.* at 76. These responsibilities include: "set[ting] up a system to prevent diversion [of opioids], including [flagging] excessive volume and other suspicious orders;" reporting suspicious orders to the relevant enforcement authorities; stopping shipments of any order which is flagged as suspicious; not filling or shipping "any suspicious prescription or order unless they have conducted an adequate investigation and determined that the prescription or order is not likely to be diverted into illegal channels;" exercising "reasonable care in delivering" the opioids; "speak[ing] accurately and truthfully . . . about opioids and their efforts to combat diversion;" and, "provid[ing] effective controls and procedures to guard against theft and diversion of the [opioids]." *Id.* at ¶¶ 76-118. The complaint alleged that the Appellant Pharmacies knowingly violated these duties and "allowed widespread diversion [of opioids] to occur," so that the Appellant Pharmacies could "focus on filling all prescriptions as quickly as possible" and "bolster their revenue, increase profit, and grow their share of the prescription painkiller market." *Id.* at ¶¶ 72, 75, and 155.

In doing so, the City alleged, the Appellant Pharmacies created "an opioid-fueled public health and safety emergency of unprecedented dimensions that has endangered, and continues to endanger, the health, safety and peace of Philadelphia and its residents." *Id.* at ¶ 547. This public health and safety emergency:

> includes historically high incidences of opioid addiction and opioid use disorder and of opioid-related deaths and non-fatal opioid overdoses. It also includes other adverse health

- 3 -

effects of opioid addiction and opioid use disorder including historically high incidences of babies born with opioid withdrawal conditions, and an unprecedented increase in new hepatitis C virus ("HCV") infections caused by opioid injections. The epidemic has also been accompanied by an unprecedented level of opioid-related emergency room visits and hospitalizations; extensive provision of emergency response services by the Fire Department and other City agencies in reviving and transporting overdose victims; and the expenditure of enormous resources by the Police Department, District Attorney's Office, Public Defender's Office, Health Department, Department of Behavioral Health and Intellectual Disability Services, Department of Human Services, and other City departments and agencies providing health and related services to address increased crime and violence and family and social dysfunction linked to opioid use and addiction. The Medical Examiner's office is struggling to keep up with the rising tide of opioid deaths. In 2017, the homicide rate in Philadelphia reached its highest level since 2012, due in part to the opioid epidemic and competition from rival drug dealers who sell opioids. The number of homicides has continued to rise.

*Id.* at ¶ 548. Further, the complaint alleged that the opioid epidemic has caused "piles of trash, needles, and other waste" to "litter[] City streets" and created the "largest open-air drug market on the East Coast" in the Kensington area of Philadelphia. *Id.* at ¶¶ 583-584. According to the complaint, this drug market consisted of "a sprawling encampment of drug users who injected themselves with opioids and heroin in broad daylight" and littered the area with "[p]iles of trash and hundreds of thousands of used needles." *Id.* at ¶ 583. This encampment was eventually shut down in 2017, due "in no small part . . . [to the] law enforcement efforts by the City." *Id.*

As is relevant to the current appeal, the City claimed that the Appellant Pharmacies created a public nuisance by "distribut[ing], dispens[ing], and

[selling] far greater quantities of prescription opioids than they knew could be necessary for legitimate medical uses, while failing to report, and to take steps to halt, suspicious orders when they were identified." The City's Complaint, 9/28/21, at ¶ 2. According to the complaint, this caused the City to "experience[] both a flood of prescription opioids available for illicit use or sale and a population of patients physically and psychologically dependent on them." *Id.* The City alleged that it sustained the following economic harm as a result of the Appellant Pharmacies' conduct:

> (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs for providing welfare for children whose parents suffer from opioid-related disability or incapacitation; (5) costs associated with law enforcement and public safety related to the opioid epidemic and (6) loss of tax revenue due to the decreased efficiency and size of the working population in the City.

*Id.* at ¶ 19.

The City sought the abatement of the public nuisance and redress for the harms caused by the public nuisance, including an order "requir[ing the Appellate Pharmacies] to pay for the cost of detoxification and treatment, including after-care, of every resident in the City currently suffering from

opioid addiction attributable to prescription opioids."[4]  *Id.* at "Wherefore" Clause; *see also id.* at ¶¶ 20-21.

As is relevant to the current appeal, the Appellant Pharmacies filed a preliminary objection in the nature of a demurrer to the City's complaint. Specifically, the Appellant Pharmacies contended that the City's public nuisance claim failed as a matter of law because "the [complaint] fail[ed] to allege a violation of a public right."  The Appellant Pharmacies' Preliminary Objections, 4/9/24, at ¶ 12.

On July 24, 2024, the trial court overruled the Appellant Pharmacies' preliminary objections, concluding that "the City has sufficiently pled a cause of action for public nuisance affecting the 'public estate' including, but not limited to, the City of Philadelphia's historic neighborhoods, parks, streets, and public spaces and the enjoyment thereof."  Trial Court Order, 7/24/24, at 1 n.1.  After the trial court denied the Appellant Pharmacies' motion to certify the July 24, 2024 interlocutory order for immediate appeal, the Appellant Pharmacies filed a petition for permission to appeal from the interlocutory order in this Court.  On November 26, 2024, this Court granted the petition. Order, 11/26/24, at 1.  The Appellant Pharmacies raise one claim on appeal:

---

[4] The City's complaint raised three counts against the Appellant Pharmacies: public nuisance; violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); and, unjust enrichment.  During the course of the proceedings, the latter two claims were dismissed, thus leaving the public nuisance claim as the only surviving claim in this litigation.  *See* Stipulation to Dismiss the UTPCPL Claim, 9/9/24, at 1; Stipulation to Dismiss the Unjust Enrichment Claim, 10/3/24, at 1.

Can the City allege a public-right violation based on the aggregation of individual harms from the abuse or misuse of government-approved prescription opioid medications distributed and dispensed by the [Appellant Pharmacies] pursuant to prescriptions from licensed doctors?

The Appellant Pharmacies' Brief at 5.

As our Supreme Court explained:

As a trial court's decision to [sustain or overrule] a demurrer involves a matter of law, our [scope of reviewing] that decision is plenary. Preliminary objections in the nature of demurrers are proper when the law is clear that a plaintiff is not entitled to recovery based on the facts alleged in the complaint. Moreover, when considering a motion for a demurrer, the trial court must accept as true all well-pleaded material facts set forth in the complaint and all inferences fairly deducible from those facts.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004)

(quotation marks and citations omitted). Further,

Our standard of review of an order of the trial court overruling or [sustaining] preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.

Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint[.] Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Bargo v. Kuhns*, 98 A.3d 686, 689 (Pa. Super. 2014) (quotation marks and citations omitted).

Our courts define the tort of public nuisance in accordance with Section 821B of the Restatement (Second) of Torts. *See*, *e.g.*, *Machipongo Land and Coal Co. v. Commonwealth*, 799 A.2d 751, 773 (Pa. 2002). This section declares:

> (1) A public nuisance is an unreasonable interference with a right common to the general public.
>
> (2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
>
>> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>>
>> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
>>
>> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B.

On appeal, the Appellant Pharmacies argue that the City's public nuisance claim fails as a matter of law because it does not allege the violation of a public right. Relying heavily on the Commonwealth Court's 2023 opinion in *Atlantic Richfield Co. v. County of Montgomery*, 294 A.3d 1274 (Pa. Cmwlth. 2023), the Appellant Pharmacies contend that the City has merely alleged "the aggregation of individual harms" and not the violation of a public right. *See* The Appellant Pharmacies' Brief at 14-32. We disagree.

"In its inception a public, or common, nuisance was an infringement of the rights of the Crown." Restatement (Second) of Torts § 821B, cmt. a. "By the time of Edward III the principle had been extended to the invasion of the rights of the public, represented by the Crown, by such things as interference with the operation of a public market or smoke from a lime-pit that inconvenienced a whole town." *Id.* "The remedy remained exclusively a criminal one in the hands of the Crown until the sixteenth century, when it was first held that a private individual who had suffered particular damage differing from that sustained by the public at large might have a tort action to recover damages for the invasion of the public right." *Id.*

The comments to Section 821B further declare:

> At common law public nuisance came to cover a large, miscellaneous and diversified group of minor criminal offenses, all of which involved some interference with the interests of the community at large – interests that were recognized as rights of the general public entitled to protection. Thus public nuisances included interference with the public health, as in the case of keeping diseased animals or the maintenance of a pond breeding malarial mosquitoes; with the public safety, as in the case of the storage of explosives in the midst of a city or the shooting of fireworks in the public streets; with the public morals, as in the case of houses of prostitution or indecent exhibitions; with the public peace, as by loud and disturbing noises; with the public comfort, as in the case of widely disseminated bad odors, dust and smoke; with the public convenience, as by the obstruction of a public highway or a navigable stream; and with a wide variety of other miscellaneous public rights of a similar kind. In each of these instances the interference with the public right was so unreasonable that it was held to constitute a criminal offense. For the same reason it also constituted a tort. Many states no longer recognize common law crimes, treating the criminal law as entirely statutory.

> But the common law tort of public nuisance still exists, and the traditional basis for determining what is a public nuisance may still be applicable.

*Id.* at cmt. b.

Although the tort of public nuisance originated in criminal law, "there is clear recognition that a defendant need not be subject to criminal responsibility" to be liable for the tort of creating a public nuisance. *See id.* at cmt. d; *see also Commonwealth v. MacDonald*, 347 A.2d 290, 303 (Pa. 1975) (plurality) ("[a] thing may be a public nuisance because it is so declared by statute, either explicitly or implicitly. Alternatively, it may be declared a nuisance as a matter of common law if, though not prohibited by statute, it unreasonably interferes with the rights of the public").

The current appeal concerns the tort's elemental requirement of an unreasonable interference with a "public right." *See* Restatement (Second) of Torts § 821B(1) ("A public nuisance is an unreasonable interference with a right common to the general public"). As to this issue, the comments to Section 821B declare:

> A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured. Thus the pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason alone become a public nuisance. If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance.

. . .

- 10 -

> It is not, however, necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large. The obstruction of a public highway is a public nuisance, although no one is travelling upon the highway or wishes to travel on it at the time. In many cases the interests of the entire community may be affected by a danger to even one individual. Thus the threat of communication of smallpox to a single person may be enough to constitute a public nuisance because of the possibility of an epidemic; and a fire hazard to one adjoining landowner may be a public nuisance because of the danger of a conflagration.

*Id.* at cmt. g.

The question of "whether there is public right[] is an issue of law." *Machipongo Land and Coal*, 799 A.2d at 773.

As noted above, the Appellant Pharmacies rely upon the Commonwealth Court's opinion in *Atlantic Richfield* to support their argument that the City's complaint fails to claim the violation of a public right.[5] In *Atlantic Richfield*, Montgomery County ("the County") sued a number of companies that manufactured lead paint for household use between the years of 1880 and 1977 ("the Manufacturers"). *Atlantic Richfield*, 294 A.3d at 1277. The

_____

[5] The Appellant Pharmacies also rely on *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021) to support their claim. *Hunter* is an opinion from the Oklahoma Supreme Court and has limited persuasive value to this Court. This is especially true in light of the fact that the *Hunter* Court emphasized its analysis and conclusion were based upon specific "Oklahoma nuisance statutes as construed by [the Oklahoma Supreme] Court," as well as "Oklahoma precedent, and the limitations [on public nuisance] set by Oklahoma case law." *Hunter*, 499 P.3d at 725 and 731.

County's complaint alleged that "[t]he use of lead paint is associated with various health hazards that have been widely known for centuries" and, "[b]ecause of its dangers, the federal government banned the manufacture and sale of lead paint in 1978." *Id.*

The County's complaint alleged that "deteriorating lead paint continues to be the primary source of lead poisoning in young children" and that lead poisoning can cause "devastating and permanent mental injuries" in these children. *Id.* Further, the County alleged that approximately 65% of the residential structures in the area "were built before lead paint was banned and, therefore, may be contaminated by lead paint." *Id.*

As is relevant to the case at bar, the County claimed that the Manufacturers of the lead paint created "a public nuisance under the common law of Pennsylvania." *Id.* at 1278. After the trial court overruled the Manufacturers' preliminary objection in the nature of a demurrer, the Commonwealth Court granted the Manufacturers' petition for permission to appeal the interlocutory order. *Id.* at 1279.

On appeal to the Commonwealth Court, the Manufacturers claimed that the public nuisance claim failed as a matter of law, as the County's complaint "fail[ed] to allege the interference with a public right." *Id.* at 1283 (quotation marks omitted). According to the Manufacturers, the County's complaint merely alleged "a risk of personal injury from lead paint to individuals within privately owned – not publicly accessible residences." *Id.* (quotation marks and corrections omitted). The Commonwealth Court agreed with the

Manufacturers and concluded that the trial court erred when it overruled the Manufacturers' preliminary objection in the nature of a demurrer. *See id.* at 1289.

According to the *Atlantic Richfield* court, the County's complaint did not allege the interference with a public right, which was necessary to support its public nuisance claim, as the allegations were limited to lead paint present in "private homes and residences throughout the County." *See id.* at 1284. The court reasoned that this aspect of the complaint rendered the allegations "akin to [a claim for the violation of] individual rights 'not to be assaulted or defamed or defrauded or negligently injured,' which cannot give rise to public nuisance actions." *Id.* at 1285, *quoting* Restatement (Second) of Torts § 821B cmt. g. The individual nature of the rights was apparent, the court reasoned, "in that one dwelling may be adversely impacted by lead paint, while others nearby may not be impacted at all." *Atlantic Richfield*, 294 A.3d at 1285.

The holding in *Atlantic Richfield* does not control the case at bar. At the outset, *Atlantic Richfield* is an opinion from the Commonwealth Court and is, thus, not binding on this Court. *See Lynn v. Aria Heath Sys.*, 227 A.3d 22, 32 (Pa. Super. 2020) ("we are not bound by decisions of the Commonwealth Court, [although] such decisions provide persuasive authority and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate") (quotation marks, citations, and corrections omitted).

Second, the **Atlantic Richfield** court held that the County's claims of harm were limited to multiple, individual injuries from lead paint contained in multiple, individual private dwellings – but did not extend to the violation of a public right or to a "communal injury." **See Atlantic Richfield**, 294 A.3d at 1285 ("[w]hile it is true that public nuisances may occur on private property, the rights that are adversely impacted must still be 'collective in nature'"). Here, however, the City has claimed a communal injury, most notably, by alleging that the Appellant Pharmacies created the opioid epidemic, which then foreseeably caused the addicted individuals to litter the public streets of Philadelphia with used hypodermic needles and to occupy a portion of the Kensington area of Philadelphia in "a sprawling encampment of drug users who injected themselves with opioids and heroin in broad daylight" and littered the area with "[p]iles of trash and hundreds of thousands of used needles." The City's Complaint, 9/28/21, at ¶¶ 583-584. As our Supreme Court has held, "the obstruction of a public highway is a public nuisance." **Presbyterian Hosp. v. City of Phila.**, 198 A. 53, 54 (Pa. 1938). Thus, based upon these allegations alone, the Appellant Pharmacies' claim fails, as the above allegations plead the violation of a public right. **See id.**

Moreover, the City alleged that the opioid epidemic – which was created, in part, by the Appellant Pharmacies – caused a dramatic increase in crime, including homicides, in the City. As one commentator wrote:

> Public authorities traditionally have criminally prosecuted or used injunctive relief to abate public nuisances threatening public safety and public health. Protecting citizens from

- 14 -

> crime and violence traditionally has been viewed as one of the core functions of public authorities. Hence, injury resulting in this context appropriately and logically should be viewed as a violation of a public right.

Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. CIN. L. REV. 741, 817-818 (2003); **see also** Restatement (Second) of Torts § 821B(2)(a) ("Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following: (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience").

In the case at bar, the City did not merely allege that the conduct of the Appellant Pharmacies injured individual people. Rather, the City alleged that the conduct of the Appellant Pharmacies injured Philadelphians in the collective sense, by harming their collective safety in the community. **See**, **e.g.**, Restatement (Second) of Torts § 821B cmt. g ("It is not . . . necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large"). This allegation thus also properly pleads the interference with a "public right."

Accepting as true all well-pleaded material facts set forth in the complaint and all inferences fairly deducible from those facts, we conclude

that the City properly pleaded the violation of a public right. The Appellant

Pharmacies' claim to the contrary thus fails.[6, 7]

_____

[6] To the extent the Appellant Pharmacies claim they cannot be liable for "another individual's use or misuse of a lawful product," we note that the crux of the City's claim is that the Appellant Pharmacies distributed mass amounts of opioids **in violation of the law and regulations to which they were beholden** and, in so doing, created an opioid epidemic in Philadelphia. *See* The City's Complaint, 9/28/21, at ¶¶ 76-118; *see also* Restatement (Second) of Torts § 821B(2)(b) ("Circumstances that may sustain a holding that an interference with a public right is unreasonable include . . . whether the conduct is proscribed by a statute, ordinance or administrative regulation"). Moreover, the Appellant Pharmacies' statement that they cannot be liable for "another individual's use or misuse of a lawful product" seems to be at odds with Section 821B of the Restatement (Second) of Torts. To be sure, as comment b of Section 821B specifically declares, an example of a common law public nuisance is "the shooting of fireworks in the public streets" – which constitutes a misuse of a lawful product that harms public safety. *See* Restatement (Second) of Torts § 821B cmt. b.

[7] We note that the Restatement (Third) of Torts: Liability for Economic Harm appears to preclude public nuisance liability for product harm. *See* Restatement (Third) of Torts: Liab. For Econ. Harm § 8 cmt. g ("Tort suits seeking to recover for public nuisance have occasionally been brought against the makers of products that have caused harm, such as tobacco, firearms, and lead paint. These cases vary in the theory of damages on which they seek recovery, but often involve claims for economic losses the plaintiffs have suffered on account of the defendant's activities; they may include the costs of removing lead paint, for example, or of providing health care to those injured by smoking cigarettes. Liability on such theories has been rejected by most courts, and is excluded by this Section, because the common law of public nuisance is an inapt vehicle for addressing the conduct at issue. Mass harms caused by dangerous products are better addressed through the law of products liability, which has been developed and refined with sensitivity to the various policies at stake"). Notwithstanding this comment, our Supreme Court has never held that this section of the Third Restatement or any of its comments correctly restates the common law of Pennsylvania.

Order affirmed.  Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/27/2026