IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Douglas Scott and              :
Linda Marie Scott,           :
          Petitioners   :
                 :
        v.          : No. 672 C.D. 2024
                 : Argued: November 5, 2025
Department of Environmental  :
Protection and Rice Drilling B LLC  :
(Environmental Hearing Board),  :
          Respondents  :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
            HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE LORI A. DUMAS, Judge
            HONORABLE STACY WALLACE, Judge
            HONORABLE MATTHEW S. WOLF, Judge

OPINION
BY JUDGE WALLACE                    FILED: April 2, 2026

In this matter, Douglas Scott and Linda Marie Scott (collectively, the Scotts) petition for review of the order of the Environmental Hearing Board (Board), dated April 29, 2024. The Board concluded in its order, among other things, that the Department of Environmental Protection (DEP) had not perpetrated an

unconstitutional "taking" by granting permits to Rice Drilling B LLC (Rice) to drill oil and gas wells through the Scotts' coal seams.[1]  After careful review, we affirm.

## BACKGROUND

The Scotts are the owners of two parcels of land (Property) in Greene County. Reproduced Record (R.R.) at 2157a.  The Scotts' ownership interest includes oil and gas rights for the Property and coal rights "except for the Pittsburgh coal seam which had been previously severed." *Id.*  The Scotts' predecessors-in-interest entered into an oil and gas lease for the Property with Peoples Natural Gas Company in 1917. *Id.* Douglas Scott purchased the Property in 2002 and entered into an amendment and ratification of the lease in 2013. *Id.*  EQT Production Company (EQT) later became the lessee under the oil and gas lease and engaged in litigation against the Scotts. *Id.* EQT and the Scotts reached a settlement agreement in 2019, providing that the Scotts would allow EQT to enter the Property and build a well pad, and that EQT would pay the Scotts $260,000. *Id.*  In addition, the Scotts entered into another amendment and ratification of the oil and gas lease and executed a "Coal Owner Permission to Drill," granting permission to Rice, EQT's subsidiary, to drill wells at 14 specified locations on the Property. *Id.* at 2157a-58a.  Rice initially drilled six wells. *Id.* at 2158a.

In 2022, Rice applied for permits from the DEP to drill an additional five wells on the Property.  R.R. at 2158a.  The planned locations for the additional wells were within 1,000 feet of an existing well and would require drilling through coal seams that the Scotts owned. *Id.*  The Scotts objected, purporting to revoke the Coal Owner Permission to Drill, and arguing Rice could not drill the wells without their consent

---

[1] The Fifth Amendment to the United States Constitution provides that private property may not be "taken for public use, without just compensation." U.S. Const. amend. V.  Additionally, article I, section 10 of the Pennsylvania Constitution provides that private property may not "be taken or applied to public use, without authority of law and without just compensation being first made or secured." Pa. Const. art. 1, § 10.

under Section 7(a)(1), and (b) of the Coal and Gas Resource Coordination Act (Act),[2] which provides:

> (a) No permit for a gas well covered by this act may be issued to drill a new gas well, or reopen a gas well which has been plugged . . . unless the proposed gas well is located not less than 1,000 feet from any other well. For the purpose of this section, "other well" shall not include any:
>
>> (1) Oil or gas well or injection well which does not penetrate a workable coal seam.
>>
>> . . . .
>
> (b) The [DEP] shall, upon request of the permit applicant or the owner of the workable coal seam which underlies the proposed gas well, grant an exception from the minimum 1,000 feet distance requirement of subsection (a), where the permit applicant and the owner of the workable coal seam consent in writing.

58 P.S. § 507(a)(1), (b).[3]

The parties submitted information to the DEP, which determined the relevant coal seams were not "workable." R.R. at 2159a. Thus, the DEP concluded Rice did not require the Scotts' consent and granted permits for the additional wells. *Id.* The Scotts appealed the permits to the Board. *Id.* However, the Scotts did not request a supersedeas, and Rice drilled the additional wells, which purportedly resulted in the

---

[2] Act of December 18, 1984, P.L. 1069, *as amended*.

[3] The Act defines a "workable coal seam" to include:

> (1) A coal seam in fact being mined in the area in question under this [A]ct by underground methods.
>
> (2) A coal seam which, in the judgment of the [DEP], can reasonably be expected to be mined by underground methods.

Section 2 of the Act, 58 P.S. § 502.

3

"sterilization of approximately 72,139 tons of coal." *Id.* at 2159a-60a. Rice filed a motion to dismiss, contending the Scotts' appeal was moot because it already drilled the wells. *Id.* at 2159a. The Board denied the motion, reasoning the Scotts presented a takings claim in their notice of appeal that was not subject to dismissal on mootness grounds. *Id.*

The Scotts, Rice, and the DEP filed motions for summary judgment. By order dated April 29, 2024, the Board granted summary judgment against the Scotts. The Board reasoned the Scotts had failed to establish a takings claim, even assuming the coal was workable and their consent was required under the Act. R.R. at 2160a. The Board explained the Scotts' coal was not taken for the "public benefit," nor had they "been forced to bear any burdens that should in all fairness and justice be borne by the public." *Id.* at 2162a-66a. To the contrary, the DEP granted permits to a private party, Rice, authorizing it to drill oil and gas wells in accordance with the law. *Id.* The Board reasoned that although the Scotts might disagree with the DEP's decision to grant permits to Rice and its determination that their coal was unworkable, there was "no basis for their claim that the [DEP] has 'taken' their coal." *Id.* at 2162a. The Board expressed concern that concluding otherwise could have severe public policy consequences and subject the DEP to a takings claim each time its permitting actions involved a private property dispute. *Id.* at 2165a-66a.

The Board went on to discuss the Scotts' contention that the DEP's permitting decision and its decision that the coal was unworkable were arbitrary and capricious, contrary to the law and the evidence, and resulted in a deprivation of the Scotts' right to due process. R.R. at 2169a. The Board explained the Scotts received due process in that they had notice and the opportunity to be heard during the permitting process and had the opportunity to appeal the DEP's permitting decision. *Id.* at 2170a. The

4

Board concluded the Scotts' claim regarding the DEP's workability determination was moot because Rice had already drilled the wells, and the Board could not grant damages or other relief to the Scotts. *Id.* at 2170a-71a. The Board found no merit to the Scotts' contentions that determining their coal was workable would affect Rice's statutory obligations, that the Board could "halt Rice's operations" while the parties resolved their dispute, and that the circumstances of this case fell within an exception to the mootness doctrine. *Id.* at 2171a-73a.

The Scotts filed a petition for review in this Court. The Scotts argue the DEP's permitting decision was a regulatory taking under the federal and state Constitutions, in that it resulted in a "physical invasion" of their Property and denied them the only economically viable use of their coal. Scotts' Br. at 23-29. The Scotts challenge the Board's rationale that the DEP's decision was not for the "public benefit" and, in the alternative, contend no public benefit was necessary for a taking to occur. *Id.* at 29-35. In addition, the Scotts argue it was unnecessary for the DEP's decision to convey property rights for a taking to occur. *Id.* at 35-37. They contend the DEP's decision was arbitrary and capricious and dispute the Board's reasoning that any challenge to the DEP's workability determination is moot.[4] *Id.* at 37-45.

**DISCUSSION**

When the Board grants summary judgment, this Court reviews whether "there has been an error of law or a manifest abuse of discretion." *Chesapeake Appalachia, L.L.C. v. Dep't of Env't Prot.*, 89 A.3d 724, 726 n.2 (Pa. Cmwlth. 2014). The Board should grant summary judgment when "there is no genuine issue of material fact and

---

[4] The Scotts also allege a violation of their right to due process, but they do not develop this issue separately from their claim that the DEP's decision was arbitrary and capricious. *See* Scotts' Reply Br. at 4 (arguing "arbitrary and capricious administrative action *in itself* constitutes a deprivation of due process").

5

. . . the moving party is entitled to judgment as a matter of law." *Id.* Regarding the Scotts' takings claim, constitutional matters present a question of law for which our standard of review is *de novo* and our scope of review is plenary. *Hufnagle v. Dep't of Transp., Bureau of Motor Vehicles*, 343 A.3d 388, 395 n.6 (Pa. Cmwlth. 2025). This means we show no deference to the Board, and we may review the entire record in reaching our decision. *See Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n*, 55 A.3d 1056, 1082 (Pa. 2012).

**Regulatory Taking**

As we noted above, the United States and Pennsylvania Constitutions prohibit the government from taking private property for public use without just compensation. *See* U.S. Const. amend. V; Pa. Const. art. 1, § 10. Our Supreme Court "continually turn[s] to federal precedent for guidance in its 'taking' jurisprudence, and indeed has adopted the analysis used by the federal courts." *City of Pittsburgh v. Weinberg*, 676 A.2d 207, 210-12 (Pa. 1996) (quoting *United Artists' Theater Cir. v. City of Philadelphia*, 635 A.2d 612, 616 (Pa. 1993)). Thus, our analysis of the Scotts' takings claim is the same under both Constitutions. *See Pa. Workers' Comp. Judges Pro. Ass'n v. Exec. Bd. of Commonwealth*, 39 A.3d 486, 496 (Pa. Cmwlth. 2012).

The Scotts first contend they suffered a regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). The United States Supreme Court in *Lucas* identified two types of government regulations that will result in a taking, including "regulations that compel the property owner to suffer a physical 'invasion' of his property" and regulations that deny "all economically beneficial or productive

6

use of land."[5] *Id.* at 1016. The Scotts argue they suffered a physical invasion of their property because the DEP's permits allowed Rice to drill through and sterilize their coal. Scotts' Br. at 23-24. In addition, the Scotts argue the DEP's permits deprived them "of the only economically viable use of the coal." *Id.* at 24.

The Scotts next contend they suffered a regulatory taking under a "traditional takings" analysis, which governs where "a regulation places limitations on land that fall short of eliminating all economically beneficial use." *Machipongo Land & Coal Co., Inc. v. Dep't of Env't Prot.,* 799 A.2d 751, 765 (Pa. 2002) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)). A "traditional taking" depends on various factors, "including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017). The Scotts argue once again that the DEP's permitting decision caused the "physical intrusion" and sterilization of their coal, which denied them any future use of the coal.[6] Scotts' Br. at 28.

Initially, the DEP's permitting decision in this case did not cause the purported sterilization of the Scotts' coal or otherwise constitute a "physical 'invasion'" of the

---

[5] As the Supreme Court later summarized, *Lucas* "included a caveat recognizing the relevance of state law and land-use customs: The complete deprivation of use will not require compensation if the challenged limitations 'inhere . . . in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership.'" *Murr v. Wisconsin*, 582 U.S. 383, 393-94 (2017) (quoting *Lucas*, 505 U.S. at 1029) (alteration in original).

[6] Notably, a government permitting decision may constitute a taking under certain circumstances. *See, e.g.*, *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985) (explaining that "[o]nly when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred"); *Sheetz v. County of El Dorado*, 601 U.S. 267, 275-76 (2024) (explaining that granting a land-use permit with conditions that lack any "essential nexus to the government's land-use interest" or "rough proportionality to the . . . impact on the land-use interest" constitutes a taking).

Property. *Lucas*, 505 U.S. at 1016. The DEP did not compel the Scotts to enter into an oil and gas lease with EQT, nor did it compel Rice to locate the wells where it did. The DEP's role was similar to that of a court, in that it applied the Act and addressed a factual question regarding the workability of the Scotts' coal. *See In re Lazy Days' RV Ctr., Inc.*, 724 F.3d 418, 425 (3d Cir. 2013) (explaining a court did not commit a taking where it did not interfere with established property rights but "adjudicated the parties' bona fide dispute regarding their rights under" a settlement agreement). The DEP determined Rice was entitled to a permit, but this alone did nothing to interfere with the Scotts' established property rights. Further, to the extent the Scotts disagree about the consequences of their legal relationships with EQT and Rice, it is a dispute between private parties.[7]

The Scotts' theory fails for the additional reason that it is speculative. In *PBS Coals, Inc. v. Department of Transportation*, 244 A.3d 386, 389-90 (Pa. 2021), the Pennsylvania Supreme Court considered a takings claim under the Eminent Domain Code,[8] alleging the Department of Transportation denied a coal owner and its lessee

---

[7] Despite the statements in *Lucas* that seemingly describe a physical invasion of property resulting from government regulation as a form of regulatory taking, *see* 505 U.S. at 1015, the United States Supreme Court has distinguished physical takings from regulatory takings as follows:

> Our cases have often described use restrictions that go "too far" as "regulatory takings." But that label can mislead. Government action that physically appropriates property is no less a physical taking because it arises from a regulation. . . . The essential question is not . . . whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree). It is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property. Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred . . . .

*Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (citations omitted). This distinction does not change our analysis, and we would conclude the Scotts are not entitled to relief even describing the DEP's actions as an alleged "*per se* physical taking" rather than a "regulatory taking." *See id.*

[8] 26 Pa.C.S. §§ 101-1106.

(collectively, Coal Companies) access to their coal by building a highway (Highway 219) on an adjacent parcel. Our Supreme Court reasoned the Coal Companies' claim failed because they were not mining the coal and did not establish they were likely to obtain a mining permit:

> The Coal Companies cannot use and enjoy their coal estate because there is no mining operation on the . . . property, and they did not meet their heavy evidentiary burden to establish any likelihood that they will be able to obtain a surface mining permit to begin a mining operation to extract the coal. . . . There is little doubt that Highway 219 **would be** the immediate and necessary consequence of the Coal Companies' inability to use and enjoy their coal estate **if** a mining operation existed, or could be commenced with a permit, on the property. However, . . . the highway is only theoretically preventing the Coal Companies from using their coal estate. As things stand, the coal estate sits idle and may not be mined; therefore **Highway 219 has not resulted in any deprivation to the Coal Companies whatsoever**. . . .

*Id.* at 406 (emphasis in original, footnote omitted). The same reasoning applies here. The Scotts argue their coal is workable under the Act and the DEP's guidance, based on thickness and "overburden." Scotts' Reply Br. at 15-16. Nonetheless, they do not argue they are actively mining, or would be likely to obtain a permit to mine, the coal in the area of Rice's wells. *See id.* at 23 n.5.

These issues aside, the DEP's permitting decision did not deprive the Scotts of "all economically beneficial or productive use" of their Property. *Lucas*, 505 U.S. at 1016. The Scotts are engaging in other economically beneficial and productive uses by entering into an oil and gas lease with EQT. Contrary to the Scotts' argument, the question is not whether they have been deprived of "their coal estate's only use," Scotts' Br. at 25, but whether the Property has been deprived of its uses as a whole. As the United States Supreme Court has explained:

9

[T]he submission that appellants may establish a "taking" simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable. . . . "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . .

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130-31 (1978). In other words, "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking." *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 327 (2002) (quoting *Andrus v. Allard*, 444 U.S. 51, 66 (1979)).

Indeed, the Pennsylvania Supreme Court has expressly refuted the contention that the loss of mining rights results in a taking where other economically viable uses remain. In concluding an "unsuitable for mining" (UFM) designation did not deprive Machipongo Land and Coal Co., Inc. (Machipongo) of all economically beneficial or productive use of its land, the Court reasoned:

Machipongo owns 373 acres in fee simple within the UFM area and 1000 acres outside of the UFM area. Within the UFM area, Machipongo owns surface rights as well as mineral rights. The regulation, therefore, does not "deprive . . . [it] of all economically beneficial" use of its property because Machipongo admits that it benefits from its surface rights by selling timber and **entering into leases for gas development**. Further evidence of the value of the Machipongo surface estate is clear from the record. Specifically, in 1994, in what Machipongo contends was a "forced sale", Machipongo received $60,000 for 35.93 acres of its property. It, therefore, appears that if Machipongo sold the remaining 373 acres of undeveloped land within the UFM area, at the same price per acre as the 1994 sale, it would earn, in 1994 dollars, at least $622,878. Clearly, the regulation does not deny Machipongo "all economically beneficial" use of its

10

property. Accordingly, we find that the regulation, as it relates to Machipongo, passes the *Lucas* test.

*Machipongo*, 799 A.2d at 769-70 (alterations in original, citations omitted, emphasis added).

The Scotts' alternative "traditional takings" argument fails for similar reasons. Using the Property for oil and gas purposes provides economic benefits to the Scotts and is consistent with any reasonable "distinct investment-backed expectations" they may have had. *Murr*, 582 U.S. at 384. The Property was already subject to an oil and gas lease when Douglas Scott purchased it in 2002, and it should come as no surprise that oil and gas development on the Property might limit other potential uses, such as mining. A "traditional takings" analysis, and any regulatory takings analysis for that matter, focuses on "regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). No matter how the Scotts present their takings claim, the DEP's permitting decision falls short of this standard.

## Mootness

In the Scotts' remaining claims, they argue the DEP's determination that their coal was unworkable was arbitrary and capricious and dispute the Board's reasoning that any challenge to the DEP's workability determination is moot. The Scotts assert Rice's own logs establish the coal was workable, but the DEP unreasonably rejected this evidence and relied instead on "blurred maps."[9] Scotts' Br. at 42-44. Although

---

[9] The Scotts argue the DEP "relied on Rice's submission of blurred zoomed-in versions of outdated mineral resource (M-68) maps which indicated only inferred coal presence from generalized data available in 1971, explicitly denoting that the data does not reflect the actual thickness of a coal seam on any one property, but only a probability." Scotts' Reply Br. at 8 (citations and quotation marks omitted).

11

Rice has already drilled through the coal, the Scotts argue the issue is not moot because Rice's statutory obligations "substantially depend and are concretely affected by whether" the coal is workable. *Id.* at 38. The Scotts also contend that reversing the workability determination would allow them to seek damages in the Court of Common Pleas. *Id.* at 39-40.

Critically, "[t]he mootness doctrine requires that an actual case or controversy must be extant at all stages of review." *Pub. Def.'s Off. of Venango Cnty. v. Venango Cnty. Ct. of Common Pleas*, 893 A.2d 1275, 1279 (Pa. 2009) (quoting *Pap's A.M. v. City of Erie*, 812 A.2d 591, 600 (Pa. 2002)). Our case law "requires a real and not a hypothetical legal controversy and one that affects another in a concrete manner so as to provide a factual predicate for reasoned adjudication, with sufficiently adverse parties to sharpen the issues for judicial resolution." *City of Philadelphia v. Se. Pa. Transp. Auth. (SEPTA)*, 937 A.2d 1176, 1179 (Pa. Cmwlth. 2007) (en banc). An issue will be moot if "a subsequent change in circumstances has eliminated the controversy so that the court lacks the ability to issue a meaningful order, that is, an order that can have any practical effect." *Burke ex rel. Burke v. Indep. Blue Cross*, 103 A.3d 1267, 1271 (Pa. 2014).

The Scotts contend that reversing the DEP's workability determination would affect Rice's statutory obligations toward the Scotts because different requirements apply when plugging a well that is drilled through a workable coal seam. Scotts' Br. at 38-39. However, the Scotts do not address the Board's reasoning that Rice drilled its wells through the Pittsburgh coal seam, which is a workable coal seam, and those same obligations would apply regardless of the determination in this case. *See* R.R. at 2171a. The Scotts also fail to address how Rice's compliance with the obligations

12

would affect them in a "concrete," rather than merely hypothetical, manner. *See City of Philadelphia*, 937 A.2d at 1179.

Regarding the Scotts' argument that they could seek damages in the Court of Common Pleas, this Court has held the Board may adjudicate a takings claim even if it lacks the ability to award damages:

> The Environmental Hearing Board Act[10] gives the [Board] jurisdiction over appeals which, *inter alia,* raise constitutional challenges to an order of the [DEP's predecessor, the Department of Environmental Resources] based upon takings-related analysis and empowers the [Board] to adjudicate the lawfulness of those orders and to set them aside if they amount to unconstitutional takings. The jurisdiction of the courts of common pleas under the Eminent Domain Code might then be invoked in order to determine the amount of damages, if any, that might have occurred as a result of the taking while it was ongoing.

*Beltrami Enters., Inc. v. Dep't of Env't Res.*, 632 A.2d 989, 993 (Pa. Cmwlth. 1993). Here, we have already considered the Scotts' takings claim and determined they are not entitled to relief. In their briefs to this Court, the Scotts do not identify any relief they could pursue in the Court of Common Pleas, other than an action resulting from their takings claim.[11] *See* Scotts' Br. at 39-40.

Finally, the Scotts' allegation of arbitrary and capricious agency conduct does not satisfy any exceptions to the mootness doctrine. "An exception to mootness will be found where (1) the conduct complained of is capable of repetition yet likely to evade judicial review; (2) the case involves issues of great public importance; or (3)

---

[10] Act of July 13, 1988, P.L. 530, 35 P.S. §§ 7511-16.

[11] The Scotts assert in their reply brief that a claim of arbitrary and capricious agency action cannot be moot. Scotts' Reply Br. at 11. The Scotts do not develop this argument and merely cite to cases suggesting damages are available for a takings claim. *See id.* at 11-13.

one party will suffer a detriment in the absence of a court determination." *Mistich v. Pa. Bd. of Prob. & Parole*, 863 A.2d 116, 119 (Pa. Cmwlth. 2004).

The Scotts do not contend their dispute with Rice regarding the workability of the coal seams will reoccur. Moreover, assuming their dispute will reoccur, it is not inherently likely to evade review because the Scotts may request a supersedeas from the Board pending appeal[12] or an injunction from the Court of Common Pleas if they disagree with the DEP's determination.[13] The Scotts' claim is not one of great public

---

[12] Section 4(d)(1) of the Environmental Hearing Board Act provides:

**(d) Supersedeas.--**

> (1) No appeal shall act as an automatic supersedeas. The [B]oard may, however, grant a supersedeas upon cause shown. The [B]oard, in granting or denying a supersedeas, shall be guided by relevant judicial precedent and the [B]oard's own precedent. Among the factors to be considered are:
>
>> (i) Irreparable harm to the petitioner.
>>
>> (ii) The likelihood of the petitioner prevailing on the merits.
>>
>> (iii) The likelihood of injury to the public or other parties, such as the permittee in third party appeals.
>
> (2) A supersedeas shall not be issued in cases where pollution or injury to the public health, safety or welfare exists or is threatened during the period when the supersedeas would be in effect.
>
> (3) The [B]oard shall promulgate regulations for issuance or denial of a temporary supersedeas.

35 P.S. § 7514(d).

[13] The Scotts suggest it would not have been possible for them to prevent the sterilization of their coal by pursuing a supersedeas or injunction because Rice began drilling the oil and gas wells only
**(Footnote continued on next page…)**

importance because it is generally a factual disagreement pertinent only to the parties in this matter. In addition, failing to rule on the Scotts' claim will not cause them to suffer a detriment because, as we explained above, the Scotts have not identified any concrete way in which reversing the workability determination would affect them or any relief they could pursue in the Court of Common Pleas as a result of a favorable decision, other than an action based on their takings claim.

## CONCLUSION

For the foregoing reasons, the DEP's decision to grant Rice permits to drill oil and gas wells did not constitute a regulatory taking of the Scotts' coal in violation of the United States or Pennsylvania Constitutions. Because Rice has already drilled the disputed wells, the Scotts' remaining claims are moot. Thus, we affirm the Board's April 29, 2024 order.

_____
STACY WALLACE, Judge

---

three days after receiving its permits. Scotts' Reply Br. at 13. At the same time, the Scotts do not dispute that the actual drilling through their coal was not complete until weeks or months later. *See* Scotts' Br. at 18.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Douglas Scott and                          :
Linda Marie Scott,                         :
                        Petitioners        :
                                           :
          v.                               : No. 672 C.D. 2024
                                           :
Department of Environmental                :
Protection and Rice Drilling B LLC         :
(Environmental Hearing Board),             :
                        Respondents  :

# **O R D E R**

**AND NOW**, this 2nd day of April 2026, the order of the Environmental Hearing Board, dated April 29, 2024, is **AFFIRMED**.

_____
STACY WALLACE, Judge